[Nos. A099858, A099864, A100892, A100895, A100896, A100897.
First Dist., Div. Five. May 21, 2004.]

PG&E CORPORATION, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
OFFICE OF RATEPAYER ADVOCATES et al., Real Parties in Interest.
[And five other cases.*]

*Pacific Gas and Electric Company v. Public Utilities Commission (A099864); Sempra Energy v. Public Utilities Commission (A100892); Sempra Energy v. Public Utilities Commission (A100895); Edison International v. Public Utilities Commission (A100896); and Edison International et al. v. Public Utilities Commission (A100897).

## Counsel

Orrick, Herrington & Sutcliffe, Frederick Brown, William F. Alderman, Howard M. Ullman, David T. Alexander, Joseph M. Malkin; Bruce Worthington and Gary P. Encinas for Petitioner PG&E Corporation.

Munger Tolles & Olson, Henry Weissmann, Jeffrey L. Bleich, Beng-Soo Kim; and Barbara E. Mathews for Petitioner Edison International.

David E. Van Iderstine for Petitioner Southern California Edison Company.

O'Melveny & Myers, John W. Stamper, Sharon L. Tomkins, Marc S. Williams; John R. Light, David B. Follet and David J. Gilmore for Petitioner Sempra Energy.

Roger J. Peters, Christopher J. Warner, Michelle L. Wilson, Shirley A. Woo; Heller, Ehrman, White & McAuliffe, Jonathan P. Hayden and Sheldon H. Jaffe for Petitioner Pacific Gas and Electric Company.

O'Melveny & Myers, John W. Stamper, Sharon L. Tomkins and Marc S. Williams for Petitioner San Diego Gas and Electric Company.

Lionel B. Wilson, Gary M. Cohen, Mary F. McKenzie, Mary M. Adu, Dale Holzschuh and Laurence G. Chaset for Respondent.

Dennis J. Herrera, City Attorney, David F. Campos and Joseph Peter Como, Deputy City Attorneys, for Real Party in Interest City and County of San Francisco.

Matthew Eric Freedman for Real Party in Interest Utility Reform Network.

OPINION

JONES, P. J.—

## I. INTRODUCTION

Disputing the jurisdiction of the Public Utilities Commission (PUC or Commission) over entities other than public utilities, the parent holding companies of California's three large investor-owned electric utilities seek to be dismissed from a pending PUC proceeding investigating actions taken by the holding companies and their utility subsidiaries during the electricity energy crisis of 2000 and 2001. The holding companies and their utility subsidiaries also challenge an interim opinion of the PUC interpreting one of the conditions imposed at the time the utilities sought approval to form holding company structures.

The challenged rulings arise out of an investigation initiated by the PUC during the height of California's electricity energy crisis in 2001. (See Cal.P.U.C. Order Instituting Investigation, Investigation No. 01-04-002 (Apr. 3, 2001) [2001 Cal.PUC LEXIS 405] (hereafter Order Instituting Investigation).) In addition to naming the utilities as parties to the investigation, the PUC also included as parties their parent holding companies—Edison International (EIX), Sempra Energy (Sempra), and PG&E Corporation (PG&E Corporation) (collectively, the holding companies).

The PUC's investigation relates back to a series of proceedings in the 1980's and 1990's in which California's investor-owned electric utilities each sought approval to reorganize under a holding company structure, which would permit each utility to become the wholly owned subsidiary of a holding company. The PUC approved the requests of the three utilities— Southern California Edison Company (Edison), San Diego Gas & Electric Company (SDG&E), and Pacific Gas and Electric Company (PG&E Utility) (collectively, the utilities)—subject to certain conditions referred to as the holding company conditions. The holding company conditions were intended to protect ratepayers and to address the potential for abuse arising from the holding company structure.

One of the holding company conditions is the so-called first priority condition, also referred to as the capital requirements condition,[1] which in general requires that the holding companies give first priority to the capital requirements of their utility subsidiaries as determined to be necessary to meet their obligation to serve. The investigation initiated by the PUC in 2001 sought to determine, among other things, whether the holding companies had violated the first priority condition by failing to infuse capital into their financially distressed utility subsidiaries.

Fundamentally, these seven petitions raise two issues. The threshold issue is whether the PUC has jurisdiction to enforce the holding company conditions against the holding companies. The second issue raised by these petitions concerns the PUC's initial interpretation of the first priority condition. We have consolidated the three petitions challenging jurisdiction; we have separately consolidated the four petitions raising substantive issues; and we have granted a writ of review in each consolidated proceeding. We now order all seven cases consolidated for purposes of decision.

On the jurisdictional question, we affirm the PUC's decisions denying the holding companies' motions to dismiss. (Cal.P.U.C. Dec. Nos. 02-01-037 (Jan. 9, 2002) [Pacific Gas and Electric Co., 2002 Cal.PUC LEXIS 7] & 02-07-044 (July 17, 2002) [Pacific Gas and Electric Co., 2002 Cal.PUC LEXIS 430].) Under the circumstances presented here, the PUC has jurisdiction over a holding company to enforce conditions imposed by the PUC pursuant to its statutory authority to approve applications by public utilities for certain mergers, acquisitions, changes in control, or issuances of securities. (See Pub. Util. Code,[2] §§ 701, 818, 819 & 854.) On the interpretation of the first priority condition, we conclude the issue is not yet ripe for review. (Cal.P.U.C. Dec. Nos. 02-01-039 (Jan. 9, 2002) [Pacific Gas and Electric Co., 2002 Cal.PUC LEXIS 5] & 02-07-043 (July 17, 2002) [Pacific Gas and Electric Co., 2002 Cal.PUC LEXIS 440].)

## II. FACTUAL AND PROCEDURAL BACKGROUND

A. *The Holding Company Decisions*

### 1. *SDG&E I*

In 1985, SDG&E was the first electricity utility to apply to the PUC to reorganize under a holding company structure in order to facilitate the

---

[1] The holding companies and utilities refer to the first priority condition as the capital requirements condition. Because the PUC uses the term "first priority condition" in its decisions, we adopt that term to refer to the holding company condition that is the subject of this dispute.

[2] All further statutory references are to the Public Utilities Code unless otherwise specified.

decision of SDG&E management to diversify its business. (*Re San Diego Gas and Electric Co.* (1986) 20 Cal.P.U.C.2d 660, 662 (*SDG&E I*).) SDG&E sought approval of its proposed reorganization under section 854, which provides that no person or corporation may acquire or control a public utility, either directly or indirectly, without first securing the authorization of the PUC.[3] (*SDG&E I, supra,* 20 Cal.P.U.C.2d at p. 662.) The proposed reorganization took the form of a reverse triangular merger, in which SDG&E would become the wholly owned subsidiary of a newly formed public utility holding company that would own the stock of the regulated utility and nonregulated affiliated enterprises. (*Ibid.;* cf. *Re Pacific Gas and Electric Co.* (1996) 69 Cal.P.U.C.2d 167, 180 & fn. 3 [describing reverse triangular merger] (*PG&E I*).)

The PUC ultimately approved SDG&E's application subject to 20 conditions intended to insulate utility operations and ratepayers from potentially adverse consequences of diversification. (*SDG&E I, supra,* 20 Cal.P.U.C.2d at pp. 662, 676–686.) Several of these conditions related to the maintenance of the utility's financial strength. (*Id.* at p. 681.) Among these financial conditions were the "balanced capital structure" condition, which requires the holding company to maintain a balanced capital structure in its utility subsidiary. Another financial condition was the "stand-alone dividend" condition, which requires the utility to continue to set its dividend policy as if it were a stand-alone entity. As relevant here, one of the conditions imposed upon SDG&E and its holding company was the "capital requirements" or "first priority" condition, which reads as follows: "The capital requirements of the utility, as determined to be necessary to meet its obligation to serve, shall be given first priority by the Board of Directors of [the holding company], and SDG&E." (*Ibid.*) Other than describing the first priority condition as a condition related to "financing priorities," the PUC's 1986 decision approving SDG&E's application contains no discussion of the meaning, purpose, or interpretation of the first priority condition. (*Ibid.*)

In the *SDG&E I* decision, the Commission devoted considerable attention to the PUC's authority to enforce the conditions. (*SDG&E I, supra,* 20 Cal.P.U.C.2d at pp. 686–687.) Parties opposing SDG&E's application "allege[d] that the Commission has questionable jurisdiction to enforce any conditions adopted in this order as against [the holding company]." (*Id.* at p. 686.) In contrast to the position SDG&E asserts now in its petition before

---

[3] In 1985, section 854 provided: "No person or corporation, whether or not organized under the laws of this state, shall, after the effective date of this section, acquire or control either directly or indirectly any public utility organized and doing business in this state without first securing authorization to do so from the commission. Any such acquisition or control without such prior authorization shall be void and of no effect. No public utility organized and doing business under the laws of this state shall aid or abet any violation of this section." (Former § 854, as added by Stats. 1971, ch. 1373, § 1, p. 2695.)

this court, SDG&E at the time argued that the PUC possesses the authority to enforce the conditions as against SDG&E *and* its holding company parent, citing section 2111[4] as evidence of the PUC's ability to enforce Commission orders violated by entities other than public utilities. Indeed, SDG&E conceded the PUC's jurisdiction by itself proposing conditions governing the holding company's activities. Additionally, if the PUC deemed it necessary, SDG&E proposed entering into a contract with its holding company parent agreeing to the performance of the conditions and naming the PUC as a third-party beneficiary to the agreement. Thus, according to SDG&E, the PUC would be entitled to sue either SDG&E or its parent holding company for specific performance of any of the conditions. (20 Cal.P.U.C.2d at p. 686.)

The PUC concluded in *SDG&E I* that it has jurisdiction over the holding company parent, reasoning as follows: "Section 854 vests in this Commission a broad authority to approve or deny applications for transfers of utility ownership or control. Implicit in this authority is the right to place reasonable conditions upon the transferor and/or transferee should a need for conditions be shown. SDG&E, on its own behalf and on behalf of [its holding company parent], itself argues this proposition. We cannot believe that the right to impose conditions carries with it no right to enforce those conditions; without the latter right, the former is meaningless." (*SDG&E I, supra,* 20 Cal.P.U.C.2d at p. 686.) The PUC went on to explain why a contract between SDG&E and its holding company parent incorporating the PUC's conditions was unnecessary, stating, "The Commission is empowered in myriad ways to secure compliance with its orders. The broad regulatory discretion described in the Public Utilities Act is ample evidence of [this] fact. SDG&E cites the most extreme example of our powers, the ability to pursue contempt remedies for regulatory law violations. SDG&E and [its parent holding company] must, under the terms of Section 854, submit to the Commission's fullest authority if they in fact intend to consummate the transactions described in their application. Having so submitted, SDG&E and [its parent holding company] need not execute their proposed contract; it would be a superfluous act in light of our existing authorities to pursue the enforcement of any of the foregoing adopted conditions."[5] (20 Cal.P.U.C.2d at pp. 686–687.)

---

[4] Section 2111 provides in relevant part: "Every corporation or person, other than a public utility and its officers, agents, or employees, which or who . . . fails to comply with any part of any order, decision, rule, direction, demand, or requirement of the commission, or who procures, aids, or abets any public utility in such violation or noncompliance, . . . is subject to a penalty . . . ."

[5] In a concurring opinion, the assigned Commissioner on the case addressed the concern that final authority for the reorganization should be deferred until legislation ensuring enforceability could be secured. (*SDG&E I, supra,* 20 Cal.P.U.C.2d at pp. 694–695 (conc. opn. of Comr. Duda).) Emphasizing that he had reviewed applicable constitutional and regulatory provisions as well as relevant case law, the Commissioner expressed that he was "convinced that more than ample authority exists for this Commission to enforce the conditions set forth today.

Ultimately, SDG&E chose not to form a holding company structure in the mid-1980's because it was unwilling to agree to some of the PUC's conditions.

### 2. *Edison*

One year after the decision in *SDG&E I*, Edison applied to the PUC under section 854 for approval to reorganize under a holding company structure implemented through a reverse triangular merger. (*Southern California Edison Co.* (1988) 27 Cal.P.U.C.2d 347, 357 (*Edison*).) The PUC approved the application, again subject to certain conditions intended to mitigate the dangers stemming from the reorganization so that ratepayers would be indifferent to the change. The PUC's decision in *SDG&E I* formed the touchstone for the analysis of Edison's application. (See *Edison*, at p. 357.) Indeed, in considering Edison's application, the PUC asked Edison to comment on each of the 20 conditions imposed in the SDG&E decision. (*Ibid.*) Once again, the first priority condition was included among the conditions imposed by the PUC.[6] (*Edison*, at p. 368.) Edison agreed to this condition without objection, and the decision contains no discussion of the meaning or application of the first priority condition. (*Ibid.*)

Unlike the decision in *SDG&E I*, which included a lengthy discussion of jurisdictional concerns, the 1988 *Edison* decision touches on jurisdictional issues only briefly. Responding to an argument that a holding company structure would reduce the PUC's regulatory oversight, the PUC stated that "[w]e do not agree that the Commission needs to exert direct authority over the holding company to regulate the utility effectively . . . . The utility must still respond to Commission orders regardless of what the parent may do." (*Edison, supra*, 27 Cal.P.U.C.2d at p. 361.) However, in a dissent from the decision to permit Edison to form a holding company structure, Commissioner Donald Vial[7] expressed his concern that the decision would limit the PUC's ability to control or regulate the new affiliate relationships under the holding company structure. (*Edison*, at p. 395 (dis. opn. of Comr. Vial).)

Edison chose to proceed with its plans to adopt a holding company structure. Accordingly, as required by the PUC's decision in *Edison*, Edison

---

Furthermore, were I not totally satisfied as to our authority to enforce the conditions, I would not sign today's order." (*Id.* at p. 695.)

[6] Other than references to the utility and its parent holding company, the wording of the first priority condition in the *Edison* decision is identical to the first priority condition in *SDG&E I*. (Compare *Edison, supra*, 27 Cal.P.U.C.2d at p. 368, with *SDG&E I, supra*, 20 Cal.P.U.C.2d at p. 681.)

[7] Commissioner Vial had been in the majority approving the SDG&E reorganization in SDG&E I. (*SDG&E I, supra*, 20 Cal.P.U.C.2d at p. 692.)

filed a written notice reflecting the agreement of Edison and its parent holding company to the conditions imposed in the decision. Like the decision in *SDG&E I*, the *Edison* decision did not require the utility to enter into a contract with its holding company parent incorporating the conditions imposed by the PUC. (See *Edison, supra,* 27 Cal.P.U.C.2d at pp. 374–376 [order approving reorganization].)

### 3. SDG&E II

In 1994, SDG&E returned to the PUC, once again seeking authorization to reorganize under a holding company structure. (*Re San Diego Gas and Electric Co.* (1995) 62 Cal.P.U.C.2d 626, 632 (*SDG&E II*).) At the time, the PUC permitted the application to proceed under section 818 of the Public Utilities Code instead of section 854 because the PUC determined the reorganization involved no change in actual control of SDG&E. Section 818 covers a utility's issuance of certain debt or equity instruments, while section 854 relates to a change in utility ownership or control.[8]

The decision to consider the application under section 818 did not result from a change in the nature of the proposed transaction, which still involved a reverse triangular merger in which SDG&E would end up becoming the wholly owned subsidiary of a parent holding company. (See *SDG&E II, supra,* 62 Cal.P.U.C.2d at p. 633.) Rather, the decision to consider the application under section 818 appears to have been motivated by a change in the wording of section 854, which had been amended by 1989 legislation. The 1989 amendments to section 854 require the PUC to make a number of specific findings before authorizing a change in control of a utility,[9] and the revised section 854 places the burden on the party seeking to obtain control of a public utility to prove by a preponderance of the evidence that the requirements of the section are met. (See former § 854, as amended by Stats. 1989, ch. 484, § 1, pp. 1706–1707.)

---

[8] Section 818 provides: "No public utility may issue stocks and stock certificates, or other evidence of interest or ownership, or bonds, notes, or other evidences of indebtedness payable at periods of more than 12 months after the date thereof unless, in addition to the other requirements of law it shall first have secured from the commission an order authorizing the issue, stating the amount thereof and the purposes to which the issue or the proceeds thereof are to be applied, and that, in the opinion of the commission, the money, property, or labor to be procured or paid for by the issue is reasonably required for the purposes specified in the order, and that, except as otherwise permitted in the order in the case of bonds, notes, or other evidences of indebtedness, such purposes are not, in whole or in part, reasonably chargeable to operating expenses or to income."

[9] Among other things, section 854 as revised by 1989 legislation would have required SDG&E to show that the reorganization provides net benefits to ratepayers in both the short term and the long term. (*SDG&E II, supra,* 62 Cal.P.U.C.2d at p. 635; § 854, subd. (b)(1).) This standard is more stringent than the "ratepayer indifference" standard applied in the 1988 *Edison* decision.

Despite considering SDG&E's application under section 818 instead of section 854, the PUC once again imposed certain conditions on the utility and its holding company in order to maintain ratepayer indifference to the proposed reorganization. Once again, the PUC referred back to its 1986 decision in *SDG&E I* as the genesis of the conditions imposed on utilities seeking to reorganize under holding company structures. (*SDG&E II, supra,* 62 Cal.P.U.C.2d at p. 635.) As before, the PUC imposed a first priority condition with wording similar to that adopted in the *SDG&E I* and *Edison* decisions: "The capital requirements of SDG&E, as determined to be necessary to meet its obligation to serve, shall be given first priority by the Board of Directors of Parent and SDG&E." (*SDG&E II,* at p. 651.)

The issue of the PUC's jurisdiction arose in the *SDG&E II* decision in the context of a request by the PUC's Division of Ratepayer Advocates to impose a condition preserving the PUC's regulatory control over SDG&E's activities. (*SDG&E II, supra,* 62 Cal.P.U.C.2d at p. 643.) The PUC rejected the proposal, reasoning that the proposed reorganization would not diminish its regulatory control and that "[a] condition neither adds to nor diminishes our regulatory control."[10] (*SDG&E II,* at p. 643.) The PUC also explained that "if [it] imposed this condition, we could expect an endless litigation in which the condition would be invoked as establishing a 'historical' test of utility regulation in 1995 as the standard by which all future regulation of SDG&E and its affiliates would be assessed. Parent, SDG&E, the electric utility industry, and our regulatory role will continue to evolve in the future as we revisit the scope and scale of regulatory interests." (*Ibid.*)

Both the utility and the holding company passed board resolutions signifying their agreement with the conditions. In 1996, SDG&E's parent holding company, Enova Corporation, applied to merge with Pacific Enterprises to form a new holding company that would eventually become Sempra Energy (Sempra), the current holding company parent of SDG&E. The PUC approved that application pursuant to section 854, once more imposing certain conditions intended to protect the public interest, and requiring that the newly formed holding company agree to those conditions.

---

[10] Sempra cites the quoted language for the proposition that even the PUC recognized that a condition does not give the PUC authority over a holding company. However, as discussed, *post,* in part III.C.5, the PUC's point was that it had authority to enforce the conditions even without a specific condition confirming that authority.

4. *PG&E*

In 1995, PG&E Utility applied under section 818 to reorganize under a holding company structure, proposing a reverse triangular merger in which PG&E Utility would become the wholly owned subsidiary of newly created holding company.[11] (*PG&E I, supra,* 69 Cal.P.U.C.2d at pp. 180–181 & fn. 3.) The PUC approved the application, subject again to conditions designed to maintain ratepayer indifference and protect the public interest, and subject to the agreement of the boards of directors of PG&E Utility and its holding company to the conditions. Once again, the PUC referred back to the "history of conditions" associated with holding company reorganizations. (*Id.* at p. 188.) Among other things, the PUC conditioned its· approval of PG&E Utility's application on compliance with the first priority condition, which was recommended jointly by PG&E Utility and the PUC's Division of Ratepayer Advocates. (*Id.* at p. 194.) As ultimately adopted by the PUC in a follow-up decision in 1999 (after an audit had been performed pursuant to the *PG&E I* decision), the PG&E first priority condition provides that "[t]he capital requirements of PG&E, as determined to be necessary and prudent to meet the obligation to serve or to operate the utility in a prudent and efficient manner, shall be given first priority by PG&E Corporation's Board of Directors." (*Re Pacific Gas and Electric Co.* (1999) 86 Cal.P.U.C.2d 76, 90 (*PG&E II*).) The Division of Ratepayer Advocates proposed adding the language, "or to operate the utility in a prudent and efficient manner," and PG&E Utility agreed to the revision. (*Ibid.*)

Unlike the earlier holding company decisions, the 1996 *PG&E I* decision and the follow-up 1999 *PG&E II* decision contain no discussion of the PUC's jurisdiction to enforce the conditions as against the holding company. PG&E Utility and its holding company parent, PG&E Corporation, agreed to the PUC's conditions.

B. *The Order Instituting Investigation*

In April 2001, the PUC instituted an investigation to determine, among other things, whether the utilities and their respective holding companies had violated the conditions imposed by the PUC when it authorized the formation of the holding companies. In its Order Instituting Investigation, the PUC cited concerns that the utilities had transferred billions of dollars to their holding companies since the advent of deregulation in the electric utility industry, including at times when the utilities were experiencing financial distress, in

---

[11] Because the proposed transaction would not result in an actual change in control of PG&E Utility, the PUC granted a motion by PG&E Utility seeking confirmation that the proposed transaction should not be classified as an acquisition activity subject to section 854. (*PG&E I, supra,* 69 Cal.P.U.C.2d at pp. 181–184.)

apparent violation of the condition that a utility must maintain a dividend policy as though it were a comparable stand-alone utility company. (See Order Instituting Investigation, *supra*, at p. 4, 2001 Cal.PUC LEXIS 405.) The PUC also cited the failure of the holding companies to financially assist the utilities when needed, in apparent violation of the condition that the holding companies give first priority to the capital needs of their utility subsidiaries. The Order Instituting Investigation directed the holding companies to demonstrate why their "evident failure to provide sufficient capital to their utility subsidiaries to alleviate or mitigate the subsidiaries' need for capital . . . did not violate, and does not continue to violate, the 'first priority' condition . . . ." (*Id.* at p. 15.)

## C. *The Motions to Dismiss for Lack of Jurisdiction*

Each of the holding companies moved for an order dismissing the holding company as a named respondent in the investigation. The holding companies argued the PUC only has subject matter jurisdiction over public utilities, that the holding companies are not public utilities, and that their agreement to be bound by the holding company conditions did not effect a waiver of the jurisdictional objections or estop them from raising such objections. In a draft decision, the PUC denied the motion based primarily on the principle of estoppel, ruling that the holding companies' acceptance of the PUC's authorization to reorganize, combined with their failure to challenge the PUC's jurisdiction at the time the conditions were imposed, precluded them from challenging the PUC's authority years later. Alternatively, the PUC held that the statutes obligating the PUC to approve the formation of holding company structures gave the PUC implied jurisdiction to issue orders binding on the holding companies as conditions to the PUC's approval.

In their comments on the draft decision, the holding companies changed their focus considerably. Although they initially appeared to contest the authority of the PUC to enforce the holding company conditions at all, the holding companies subsequently conceded that the conditions are enforceable, but only in an action for breach of contract brought in superior court, not in a proceeding before the PUC.[12]

In a January 9, 2002 decision, the PUC denied the motions to dismiss. In addition to holding that it had jurisdiction over the holding companies to

---

[12] Sempra contends it has always agreed the conditions are enforceable in a proceeding in superior court. However, on review of the initial motions to dismiss, we find no acknowledgment by the holding companies that they are bound by the conditions, except for a footnote in PG&E Corporation's motion to dismiss, in which PG&E Corporation reluctantly conceded the conditions might give rise to a contractual relationship, stating "[t]o the extent the Commission might contend that the Conditions create some type of continuing relationship between the Commission and PG&E Corporation, that relationship, if any, could be nothing more than contractual."

enforce the holding company conditions, the PUC held that it retained the power under section 1708 to modify, clarify, or add to the conditions initially imposed in the underlying proceedings. Two of the five commissioners dissented. In their dissent, Commissioners Duque and Bilas agreed with the holding companies that the PUC lacks jurisdiction over them, concluding that the holding company conditions are enforceable, but only in an action brought in superior court. The dissent took particular exception to the portion of the decision in which the PUC concluded it had authority to modify or add to the conditions imposed on the holding companies.

The holding companies sought a rehearing of the decision. In a now unanimous decision filed July 17, 2002, the PUC modified its earlier decision and denied rehearing.[13] Although the PUC in its original decision had based its denial on a variety of theories, including estoppel, the PUC in its order on rehearing based its denial solely on the ground that it has jurisdiction over the holding companies to enforce the holding company conditions by virtue of the statutes giving the PUC the authority to approve reorganizations or issuances of certain securities and debt instruments subject to conditions. In addition to denying rehearing, the decision also modified the original decision to delete the conclusions criticized by the dissenters regarding the PUC's continuing jurisdiction to add to or modify the holding company conditions.

D. *Interim Opinion on Interpretation of First Priority Condition*

In connection with its Order Instituting Investigation, the PUC asked the holding companies to furnish information regarding whether they had provided sufficient capital to their utility subsidiaries to alleviate or mitigate the subsidiaries' need for capital during the electricity energy crisis of 2000 and 2001. In response to these requests, the holding companies suggested among other things that the financial needs of their utility subsidiaries constituted needs for operating cash, or working capital, and that these needs do not implicate the first priority condition, because the condition is limited to a utility's needs for equity capital. To resolve this issue, the PUC ordered briefing on the meaning of the first priority condition.

In a January 9, 2002 decision, the PUC provided its interim opinion on the meaning of the first priority condition. The PUC found that the condition's reference to capital must be interpreted expansively and not just limited to equity capital or to investment in the utilities' plant and equipment. The PUC found that, under "certain circumstances," "the condition includes the requirement that the holding companies infuse all types of 'capital' into their

---

[13] One Commissioner, who had not participated in the original decision, abstained from the decision denying rehearing.

respective utility subsidiaries when necessary to fulfill the utility's obligation to serve." (Cal.P.U.C. Dec. No. 02-01-039, *supra*, at p. 2, 2002 Cal.PUC LEXIS 5, at p. *2.) Notably, the PUC made no finding that any holding company or utility had violated the first priority condition. The decision states that "[f]inding such a violation requires a case-by-case analysis of each Respondent's individual circumstances that will be the subject of later proceedings in this docket." (*Ibid.*)

Two of the five commissioners dissented. The two dissenting commissioners, Commissioners Duque and Bilas, were the same commissioners who dissented in the PUC's original decision on the motion to dismiss. One commissioner, Commissioner Brown, filed a separate concurrence in which he opined that the first priority condition "should be qualified," and although he believed that the condition "requires the holding company to do more than look to the capital assets or investment in infrastructure, [he did] not believe it connotes an unlimited responsibility to keep cash flowing from the holding company to the utility where the Commission has failed to allow compensatory utility rates." (Cal.P.U.C. Dec. No. 02-01-039, *supra*, at p. 43, 2002 Cal.PUC LEXIS 5, at p. *64 (conc. opn. of Comr. Brown).)

In the PUC's original, January 9, 2002, decision on the meaning of the first priority condition, the PUC dismissed PG&E Corporation from the proceeding without prejudice, but not for jurisdictional reasons. Rather, the dismissal apparently resulted from concerns about a PG&E Utility bankruptcy reorganization plan[14] that proposed transferring PG&E Utility assets to affiliates of PG&E Corporation, transfers the PUC indicated may violate the first priority condition or otherwise reflect sweetheart deals between PG&E Utility and PG&E Corporation. The PUC explained PG&E Corporation's dismissal as follows: "In view of the potentially serious adverse impacts on both PG&E [Utility] and ratepayers that are likely to result in the event that the [bankruptcy plan] is adopted, and in view of the expedited time frame on which the PG&E [Utility] bankruptcy case is moving forward, we will dismiss PG&E Corp. from this proceeding without prejudice so that the issue of whether the adoption of the [bankruptcy plan] would result in a violation of the first priority condition can be resolved in the appropriate judicial forums."[15] (Cal.P.U.C. Dec. No. 02-01-039, *supra*, at pp. 35–36, 2002 Cal.PUC LEXIS 5, at p. *53, fn. omitted.)

---

[14] At the request of PG&E Utility, we take judicial notice of PG&E Utility's voluntary petition under Chapter 11 of the federal Bankruptcy Code (11 U.S.C. § 1109 et seq.), filed April 6, 2001, as case number 01-30923, 283 B.R. 41 in the United States Bankruptcy Court, Northern District of California. (Evid. Code, §§ 452, subd. (d), 459.)

[15] Although PG&E Corporation has been dismissed without prejudice from the PUC proceeding, PG&E Corporation still urges this court to review the PUC decisions denying its motion to dismiss and offering an interim opinion on the meaning of the first priority condition. As PG&E Corporation points out, the PUC still maintains it has jurisdiction to

The holding companies and the utilities sought a rehearing of the decision, maintaining that the first priority condition "requires only that they maintain a certain level of capital expenditure or equity investment in the utilities' plant and equipment." (Cal.P.U.C. Dec. No. 02-07-043, *supra,* at p. 2, 2002 Cal.PUC LEXIS 440.) In a July 17, 2002 decision, the PUC denied rehearing, although it modified its earlier decision slightly, including adding the finding of fact that "[t]he Commission has made no final determination that any utility or holding company violated the first priority condition, or that any particular remedy should follow." (*Id.* at p. 41.) The decision was unanimous, with one abstention.

## E. *The Petitions for Writ of Review*

These petitions followed. Three petitions, filed by the holding companies— PG&E Corporation, EIX, and Sempra—challenge the PUC's decision denying the holding companies' motions to dismiss for lack of jurisdiction. Four petitions, filed by the holding companies and their utility subsidiaries— PG&E Corporation, PG&E Utility, EIX/Edison, and Sempra/SDG&E— challenge the PUC's interim opinion on the meaning of the first priority condition.[16]

In the proceedings before the PUC, a number of parties of record presented positions adverse to the petitioners. Under rule 58(a) of the California Rules of Court, these parties are designated as real parties in interest in these writ proceedings. Of the parties of record that presented positions before the PUC, only the City and County of San Francisco and The Utility Reform Network (TURN), a ratepayer advocacy organization, filed answers to one or more of the petitions filed in this court.

---

enforce the holding company conditions, and it could rename PG&E Corporation as a respondent at any time. The PUC does not contest PG&E Corporation's standing to pursue writ relief in these proceedings, nor does the PUC contend the dismissal of PG&E Corporation has rendered the matter moot as to PG&E Corporation. Therefore, notwithstanding the dismissal without prejudice of PG&E Corporation from the PUC proceeding, the writs of review issued in these proceedings encompass, and we address, the two petitions filed by PG&E Corporation.

[16] The petitions were filed in the appellate districts in which the holding companies have their principal place of business. Accordingly, PG&E Corporation and PG&E Utility filed petitions in the First Appellate District, Edison and EIX filed petitions in the Second Appellate District, and Sempra and SDG&E filed petitions in the Fourth Appellate District. At the request of the PUC the Chief Justice ordered the petitions originally filed in the Second Appellate District and the Fourth Appellate District transferred to the First Appellate District pursuant to California Rules of Court, former rule 20(a) (subsequently redesignated rule 47.1(a)).

## III. DISCUSSION

### A. *Propriety of Writ Review*

"[A]ny aggrieved party [to a PUC decision] may petition for a writ of review in the court of appeal . . . ." (§ 1756, subd. (a).) Where, as here, "writ review is the exclusive means of appellate review of a final order or judgment, an appellate court may not deny an apparently meritorious writ petition, timely presented in a formally and procedurally sufficient manner, merely because, for example, the petition presents no important issue of law or because the court considers the case less worthy of its attention than other matters." (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 114 [40 Cal.Rptr.2d 839, 893 P.2d 1160], fn. omitted.) We are not, however, "compelled to issue the writ if the PUC did not err . . . ." (*Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 282 [93 Cal.Rptr.2d 910], fn. omitted.)

Although we deny the relief requested by petitioners in this decision, we nevertheless granted a writ of review because the petitions present important and unsettled legal questions. In addition, although summary denial of a petition seeking prerogative writs such as mandate and prohibition does not preclude further litigation of the issues presented, a summary denial of a petition for writ of review from a PUC order acts as law of the case, precluding further litigation between the parties of the challenged PUC order. (Compare *Kowis v. Howard* (1992) 3 Cal.4th 888, 891 & 897, fn. 2 [12 Cal.Rptr.2d 728, 838 P.2d 250], with *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 901 [160 Cal.Rptr. 124, 603 P.2d 41] (*CLAM*).) The rationale for this distinction is that a petition for writ of review is the sole means of appellate review and serves the function of an appeal, so that a denial "must therefore be deemed a decision on the merits" that "raises the bar of res judicata against relitigation of the same cause of action between the same parties or their privies." (*CLAM, supra,* 25 Cal.3d at p. 901.) Although a summary denial of the subject petitions for writ of review has no precedential value and is not binding on nonparties (*id.* at p. 902), it would foreclose any further litigation on the issues presented in the petitions between the holding companies and the PUC, at least in the context of the current proceeding initiated by the Order Instituting Investigation.

In light of the preclusive effect given to the summary denial of a petition for writ of review from a PUC order, we have granted a writ of review with respect to the PUC's interim opinion on the meaning of the first priority condition to clarify that our denial should not be given law of the case effect. Rather, because we have concluded the issue of the condition's interpretation

is not ripe for review, our denial is without prejudice to the right of any party to raise the issue anew after there has been a determination that one or more of the holding companies have violated the first priority condition and, if so, what remedies are appropriate. (Cf. *CLAM, supra,* 25 Cal.3d at pp. 903–904 [when petition denied as unripe, court does not adjudicate petition's substantive issues].)

## B. *Standard of Review*

Section 1757 defines the scope of our review of PUC decisions. We are authorized to determine whether the PUC has "acted without, or in excess of, its power or jurisdiction," "has not proceeded in the manner required by law," has issued a decision "not supported by the findings," has issued findings "not supported by substantial evidence in light of the whole record," has issued an order or decision that was "procured by fraud or was an abuse of discretion," or has violated "any right of the petitioner" under the United States or California Constitution. (§ 1757, subd. (a).)

The PUC contends its interpretation of the Public Utilities Code should be given great weight because the PUC is the agency constitutionally authorized to administer the provisions of the Public Utilities Code. EIX in contrast argues that the PUC's interpretation of the scope of its own jurisdiction, even if based on the Public Utilities Code, is not entitled to deference.

■ In general, an agency's interpretation of statutes within its administrative jurisdiction is given presumptive value as a consequence of the agency's special familiarity and presumed expertise with satellite legal and regulatory issues. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha Corp.*).) Ordinarily, therefore, the PUC's "interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language . . . ." (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410–411 [67 Cal.Rptr. 97, 438 P.2d 801].) However, "the general rule of deference to interpretations of statutes subject to the regulatory jurisdiction of agencies does not apply when the issue is the scope of the agency's jurisdiction." (*Kaiser Foundation Health Plan, Inc. v. Zingale* (2002) 99 Cal.App.4th 1018, 1028 [121 Cal.Rptr.2d 741].)[17] Even in cases not questioning the jurisdiction of an agency, the

---

[17] We recognize that, unlike the agency whose jurisdiction was at issue in *Kaiser Foundation Health Plan, Inc. v. Zingale, supra,* 99 Cal.App.4th 1018 (specifically, the Department of Managed Health Care), the PUC "is not an ordinary administrative agency," but is instead "a constitutional body with broad legislative and judicial powers." (*Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 300 [91 Cal.Rptr.2d 479].)

interpretation of statutes is a question of law subject to independent judicial review. (*Yamaha Corp., supra,* 19 Cal.4th at p. 7.)

In interpreting statutes, we are free to "tak[e] into account" agency interpretations, but such agency interpretations "are not binding or necessarily even authoritative." (*Yamaha Corp., supra,* 19 Cal.4th at pp. 7–8.) The weight we attach to agency interpretations is "contextual," and depends on factors such as " 'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control. [Citation.]' " (*Id.* at pp. 14–15, quoting *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 65 S.Ct. 161], italics omitted.)

■ We conclude that the PUC's interpretation of the scope of its own jurisdiction must bear more than just a "reasonable relation" to statutory purposes and language, although we disagree with EIX's contention that the PUC's interpretation is entitled to no deference. Here, the PUC contends it is authorized by statute to impose and enforce conditions pursuant to its statutory power to approve changes in control and issuances of securities by public utilities. Although the scope of the PUC's jurisdiction is ultimately a legal question subject to independent review, in deciding this issue we necessarily take into account the PUC's interpretation of the statutes it is charged to administer, mindful that the PUC's interpretation is not controlling but is accorded weight commensurate with the thoroughness, validity, and consistency of the PUC's reasoning. The PUC's interpretation is one of "among several tools available to the court" in determining the meaning and legal effect of a statute. (*Yamaha Corp., supra,* 19 Cal.4th at p. 7.)

C. *Jurisdiction of the PUC to Enforce Holding Company Conditions*

1. *The Grounds for the PUC's Decision*

The PUC's rationale for denying the holding companies' motions to dismiss is most concisely expressed in Decision No. 02-07-044, the decision denying rehearing. In that decision, the PUC maintains the Legislature has granted the PUC specific authority to enforce the holding company conditions.

The PUC approved the holding company applications of SDG&E and PG&E Utility under section 818, which provides that no public utility may issue stocks or certain forms of indebtedness without obtaining the PUC's prior approval. Section 819 bolsters the preapproval requirement of section 818, authorizing the PUC to refuse an application, modify the request, or "grant it subject to such conditions as it deems reasonable and necessary." (§ 819.)

The PUC approved Edison's holding company application under section 854, which at the time provided that no person or corporation could acquire control of a public utility "without first securing authorization to do so from the [PUC]." (Former § 854, as added by Stats. 1971, ch. 1373, § 1, p. 2695.) As discussed earlier, section 854 was amended after 1989, in relevant part, to permit the PUC to "provide mitigation measures to prevent significant adverse consequences which may result" from a proposed merger or change in control governed by section 854. (§ 854, subd. (c)(8).) Although the version of section 854 in effect at the time of the Edison holding company approval did not expressly authorize mitigation measures, the PUC noted that "no one has questioned the Commission's earlier authority to fashion section 854 conditions, as we did without challenge in approving the Edison holding company." (Cal.P.U.C. Dec. No. 02-07-044, *supra*, at p. 5, 2002 Cal.PUC LEXIS 430, at p. *7.)

Indeed, none of the holding companies disputes the statutory authority of the PUC to impose conditions pursuant to either sections 818, 819, or 854, at least at the time the PUC approved the formation of the holding companies. The holding companies assert, in effect, that this authority is evanescent, leaving the PUC with no jurisdiction to enforce the conditions in proceedings before the PUC after the conditions have been imposed.[18]

According to the PUC, "[it] makes little sense to grant the Commission authority over protecting the public interest through conditions and mitigation measures, but not allow it to exercise its traditional functions to oversee and enforce those measures." (Cal.P.U.C. Dec. No. 02-07-044, *supra*, at p. 5, 2002 Cal.PUC LEXIS 430, at p. *7.) Beyond this commonsense response to the holding companies' arguments, the PUC relies on section 701, which provides that the PUC may do all things necessary and convenient in the exercise of its power and jurisdiction to supervise and regulate every public utility, whether or not such measures are specifically designated in the Public

---

[18] For example, PG&E Corporation "does not dispute the Commission's authority under section 818 to condition its order allowing the Utility to issue stock necessary to form the holding company," nor does PG&E "contest the Commission's authority to require PG&E Utility to secure an agreement from PG&E Corporation to abide by certain conditions," but section 818 does not "suggest that the Commission has jurisdiction to enforce those conditions against the holding company in proceedings before the Commission." Sempra acknowledges that section 818 and 854 "permit the Commission to impose conditions when approving a holding company structure [but] they do not, as the Commission argues, include the authority to enforce them against a non-public utility in a Commission proceeding." And EIX "does not dispute that the requirement of authorization [in section 854] implied that the Commission also had the right to condition its grant of approval," although EIX contends that section 854 "in no way provides a grant of on-going jurisdiction . . . ."

Utilities Code.[19] Thus, the PUC maintains, "When read in conjunction with section 701, sections 818, 819, and 854 provide the Commission with continuing jurisdiction over the holding companies for the limited purpose of monitoring and enforcing the holding company conditions." (Cal.P.U.C. Dec. No. 02-07-044, 2002 Cal.PUC LEXIS 430, at pp. *6–*7.)

> 2. *Contrary to the Claims of the Holding Companies, the PUC Does Not Seek to Assert General Jurisdiction over the Holding Companies.*

Fundamentally, the holding companies object to the PUC's assertion of jurisdiction because they claim the PUC's jurisdiction is limited to the regulation of "public utilities."[20] Although the PUC concedes that the holding companies are not public utilities, the PUC nevertheless argues it can assert *limited* jurisdiction over the holding companies to enforce the holding company conditions. The PUC claims it has never sought to exercise general or plenary regulatory powers over the holding companies, which mistakenly rely on statutory interpretations and case law focusing solely on the PUC's *general* jurisdiction over public utilities.

■ The PUC is constitutionally vested with the authority to regulate public utilities. (Cal. Const., art. XII, §§ 1–6.) As set forth in section 216, subdivision (a), the definition of "public utility" encompasses entities that are "electrical corporation[s]." It is undisputed that the holding companies are not "public utilities" as that term in defined in the Public Utilities Code.

The California Constitution, however, also provides that "[t]he Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, *to confer additional authority and jurisdiction upon the commission . . . .*" (Cal. Const., art. XII, § 5, italics added.) As our Supreme Court has recognized, citing the Legislature's plenary power to confer additional jurisdiction on the PUC, "[t]he commission's powers . . . are not restricted to those expressly mentioned in the Constitution." (*CLAM, supra,* 25 Cal.3d at p. 905.) Thus, for example, there is no dispute that, when authorized by the Legislature, the PUC may exercise limited jurisdiction over entities other than public utilities. (See, e.g., § 394.1 [jurisdiction over energy

---

[19] Section 701 provides that "[t]he commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."

[20] When we refer to arguments made by the holding companies, we do not necessarily mean to imply that all of the holding companies advanced an argument in precisely the same manner, or at all. Where a particular holding company is the only petitioner making an argument, however, we have endeavored to identify the position's proponent.

service providers]; § 739.5 [jurisdiction over mobilehome parks]; § 99152 [jurisdiction over public transit].) Indeed, the holding companies do not suggest such grants of authority are beyond the power of the Legislature. Accordingly, the holding companies are incorrect in their assertion that, as a general principle, the PUC's jurisdiction is limited to public utilities.

■ The PUC contends the Legislature has conferred limited jurisdiction upon the PUC to impose and enforce the holding company conditions pursuant to sections 701, 818, 819, and 854, in recognition of the risks to ratepayers when utilities change ownership or issue securities. Indeed, the PUC claims it would likely violate its public interest mandate[21] by approving utility applications to form holding companies without the ability to assert continuing jurisdiction to enforce the holding company conditions. Section 701 is of particular relevance because it allows the PUC to "do all things . . . necessary and convenient" in the exercise of its authority over public utilities whether or not "specifically designated" in the Public Utilities Code. Where the authority sought is "cognate and germane" to utility regulation, the PUC's authority under section 701 has been liberally construed. (*CLAM, supra,* 25 Cal.3d at pp. 905–906; *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 792 [3 Cal.Rptr.3d 703, 74 P.3d 795]; *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 915 [55 Cal.Rptr.2d 724, 920 P.2d 669].) The holding companies correctly point out that section 701 has never been read to expand the scope of the PUC's jurisdiction beyond public utilities, at least in any citable appellate opinion.[22] ■ However, contrary to the holding companies' contentions, nothing in section 701 or elsewhere limits that statute's reach to public utilities. Although the statute initially refers to the PUC's power to "supervise and regulate every public utility," the PUC's authority to do all things "necessary and convenient" in the exercise of that power is not expressly limited to actions against public utilities. (§ 701.)

While the holding companies effectively concede the jurisdiction of the PUC to impose conditions under sections 818, 819, and 854,[23] they argue that section 701 does not operate as an independent source of jurisdiction for the PUC to enforce the conditions, citing *Assembly v. Public Utilities Com.* (1995) 12 Cal.4th 87 [48 Cal.Rptr.2d 54, 906 P.2d 1209](*Assembly*). In

---

[21] The PUC has a mandate to protect the public interest in its oversight of utility actions and ensure that customers receive adequate service at just and reasonable rates. (*Sale v. Railroad Commission* (1940) 15 Cal.2d 612, 617 [104 P.2d 38].)

[22] The PUC cites one case in which the First District Court of Appeal summarily denied a writ petition challenging the PUC's reliance on section 701 to justify its jurisdiction over an entity other than a public utility. As discussed in part III.A (Propriety of Writ Review), *ante,* while that summary denial may have had law of the case effect on the parties, it has no stare decisis effect or precedential value.

[23] See footnote 18, *ante.*

*Assembly*, our Supreme Court "rejected a construction of section 701 that would confer upon the Commission powers contrary to other legislative directives . . . ." (*Id.* at p. 103.) Likewise, as the holding companies point out, the Supreme Court in *Pacific Tel. & Tel. Co. v. Public Util. Com.* (1965) 62 Cal.2d 634, 653 [44 Cal.Rptr. 1, 401 P.2d 353] (*Pacific Tel. & Tel. Co.*), held that section 701 "does not authorize disregard by the commission of express legislative directions to it, or restrictions upon its power found in other provisions of the act or elsewhere in general law."

The holding companies' reliance on *Assembly* and *Pacific Tel. & Tel. Co.* is misplaced. In *Assembly*, the PUC attempted to rely on section 701 as authority to direct ratepayers refunds from Pacific Bell to a school telecommunications infrastructure fund, despite an express statutory mandate (§ 453.5) that such refunds be returned to ratepayers. (*Assembly, supra,* 12 Cal.4th at pp. 102–104.) In *Pacific Tel. & Tel. Co.*, the PUC directed a utility to refund to ratepayers amounts collected under a previously approved rate schedule based on the PUC's conclusion that past rates should have been lower, notwithstanding express direction from the Legislature that the PUC's orders fixing rates must be prospective only. (*Pacific Tel. & Tel. Co, supra,* 62 Cal.2d at pp. 649–650, 653.) In both *Assembly* and *Pacific Tel. & Tel. Co.*, section 701 was inapplicable because the actions of the PUC disregarded "express legislative directives." (*Assembly, supra,* 12 Cal.4th at pp. 103–104; *Pac. Tel. & Tel. Co., supra,* 62 Cal.2d at p. 653.) Here, by contrast, the holding companies fail to point to any statutory mandate or directive forbidding the PUC from enforcing the holding company conditions, and we are aware of none.[24]

The holding companies also cite and rely on *Television Transmission v. Public Util. Com.* (1956) 47 Cal.2d 82 [301 P.2d 862] (*Television Transmission*), and *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256 [115 Cal.Rptr.2d 874, 38 P.3d 1098] (*Hartwell*), for the proposition that the PUC has no authority over entities other than public utilities. Neither case supports the proposition that the PUC cannot exercise limited jurisdiction to enforce the holding company conditions.

In *Television Transmission,* the PUC attempted to exercise its general jurisdiction over a local cable television company by classifying the company as a "telephone corporation . . . subject to its jurisdiction." (*Television Transmission, supra,* 47 Cal.2d at p. 86, fn. omitted.) The Supreme Court held that the cable television company did not fall within the enumerated

---

[24] In *Southern California Edison Co. v. Peevey, supra,* 31 Cal.4th at page 792, the Supreme Court acknowledged that when the PUC has inherent authority to act, such authority is only limited when barred by some specific statutory limit on the PUC's power.

classes of public utilities, and as a consequence, "the commission had no jurisdiction to issue the orders in question." (*Id.* at p. 89.)

In *Hartwell,* an action in which the PUC was not a party, the Supreme Court considered superior court jurisdiction over "parties not subject to PUC regulation" on issues tangentially related to the PUC's jurisdiction. (*Hartwell, supra,* 27 Cal.4th at p. 280.) In particular, a nonregulated water provider contended that a superior court action against it was barred by virtue of section 1759, which in general provides that no court except the Supreme Court or Court of Appeal shall have jurisdiction to review, reverse, correct, or annul any order or decision of the PUC. While acknowledging it was not subject to the jurisdiction of the PUC, the nonregulated water provider nevertheless contended that section 1759 precluded the superior court action against it because the issues presented were identical to issues in proceedings then before the PUC involving regulated water providers. (27 Cal.4th at p. 279.) Rejecting this "issue oriented analysis" for application of section 1759, the Supreme Court held that section 1759 "must be read to bar superior court jurisdiction that interferes with the PUC's performance of its *regulatory* duties, duties which by constitutional mandate apply only to regulated utilities." (*Hartwell,* at pp. 280–281.)

As the Supreme Court observed in *Hartwell,* " '[l]anguage used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered.' " (*Hartwell, supra,* 27 Cal.4th at p. 281, quoting *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) The statements in *Television Transmission* and *Hartwell* to the effect the PUC's jurisdiction is limited to regulated utilities must be considered in the context of those cases. Indeed, lacking the context in which the statements arose, they appear to be directly at odds with statutes granting the PUC limited jurisdiction over entities not otherwise defined as public utilities. (See, e.g., § 394.1 [jurisdiction over energy service providers]; § 739.5 [jurisdiction over mobilehome parks]; § 99152 [jurisdiction over public transit].) The holding companies misread *Television Transmission* and *Hartwell,* which concern the PUC's general or plenary jurisdiction. Those decisions, to the extent they apply beyond their unique sets of facts, do not foreclose the PUC's assertion of limited jurisdiction to enforce conditions it is statutorily empowered to impose, provided such conditions are cognate and germane to utility regulation.

Moreover, unlike the fact scenario in *Television Transmission,* the PUC does not seek to assert jurisdiction over the holding companies by classifying them as public utilities. The PUC expressly acknowledges the holding companies are not public utilities. Unlike the cable television company in

*Television Transmission,* which was not a public utility and otherwise had no connection to a regulated entity, the holding companies here are bound by conditions imposed by the PUC concerning their dealings with entities that are unquestionably public utilities subject to the PUC's jurisdiction. Thus, the PUC's exercise of limited jurisdiction over the holding companies is cognate and germane to its regulation of a public utility, namely, the utility subsidiary of the holding company. Furthermore, in contrast to *Hartwell,* in which an unregulated entity sought to employ an issue-oriented analysis for determining what falls within the PUC's jurisdiction, the PUC here did not attempt to justify its limited jurisdiction over the holding companies simply by reference to the issues presented in the dispute.

EIX raises the specter that, under the guise of doing all things "necessary and convenient" in the exercise of its powers, the PUC could seek to regulate every person or entity that does business with public utilities. This concern is unjustified and overblown. We reiterate that the PUC does not seek to exercise general regulatory control over the holding companies as if they were public utilities; it merely seeks to enforce the holding company conditions that were the preconditions to formation of the holding companies. The mere fact the holding companies do business with their utility subsidiaries is not the basis for the PUC asserting jurisdiction. Unlike the holding companies, most entities that have business dealings with public utilities have not agreed to PUC-imposed conditions embodied in orders approving the entity's formation. In addition, the holding companies are much more than just entities "doing business with" public utilities. Concerns about potential abuses in the relationship between a holding company and its utility subsidiary led to the imposition of holding company conditions. Those concerns remain ongoing.

■ The primary limiting factor on PUC jurisdiction is that the PUC's action must be cognate and germane to utility *regulation.* We do not suggest that the PUC has enforcement authority over entities other than public utilities simply because it has the power to approve certain transactions involving public utilities subject to conditions. The conditions and the PUC's interest in their enforcement must directly relate to some aspect of utility regulation. In these actions, there is little doubt that the disputed holding company conditions are germane to aspects of the PUC's regulatory authority over the subsidiary utilities. ■ Accordingly, absent a specific legislative directive prohibiting the PUC from enforcing conditions it is empowered to impose, we conclude the PUC has jurisdiction under the circumstances presented here to enforce the conditions in a proceeding before the PUC.

3. *The Absence of Express Statutory Authority to Enforce the Holding Company Conditions Does Not Imply the PUC Lacks Jurisdiction To Do So.*

While acknowledging the power of the Legislature to confer limited PUC jurisdiction over nonutilities, PG&E Corporation and EIX assert that a statute cannot confer PUC jurisdiction over entities other than public utilities unless it does so explicitly and unambiguously. PG&E Corporation offers as authority for this proposition *Pac. Tel. & Tel. Co. v. Public Utilities Com.* (1950) 34 Cal.2d 822 [215 P.2d 441] (*Pacific Telephone*). In *Pacific Telephone*, the PUC found that fees paid by Pacific Telephone to its parent, AT&T, were excessive. (*Id.* at p. 824.) To redress the problem, the PUC ordered Pacific Telephone to pay no more than the reasonable costs incurred in the rendition of AT&T's services to Pacific Telephone. Over a number of dissents, the Supreme Court held that the PUC had exceeded its jurisdiction. The Supreme Court stated: "In the absence of express statutory authority it has generally been held that a commission's control over contracts between affiliated corporations is limited to disallowance of excessive payments for the purpose of fixing rates. [Citations.]" (*Id.* at p. 830.) The Supreme Court concluded that "[t]he Public Utilities Act is silent on the question of affiliated corporations, and only the Legislature can properly decide whether they present such dangers of abuse that the commission should have broader regulatory powers over them than it now has." (*Id.* at p. 832.) The holding companies maintain that *Pacific Telephone* confirms the limits of PUC authority over affiliates of public utilities.

Upon closer examination, the holding in *Pacific Telephone* is much more limited than the holding companies suggest. Perhaps more importantly, the court's reasoning in *Pacific Telephone* has little or no continuing vitality in light of the Supreme Court's subsequent decision in *General Telephone Co. v. Public Utilities Com.* (1983) 34 Cal.3d 817 [195 Cal.Rptr. 695, 670 P.2d 349] (*General Telephone*). *Pacific Telephone* concerned PUC regulation of a contract between a utility subsidiary and its parent; it did not concern the enforcement of conditions imposed upon the parent at the time of its formation. In addition, the majority in *Pacific Telephone* recognized that the PUC could treat affiliated corporations differently from other contracting parties only if the Legislature so provided *or* if the affiliated corporations "are used as a device to defeat the exercise of powers the commission has been granted." (*Pacific Telephone, supra,* 34 Cal.2d at p. 832.) Thus, the Supreme Court recognized a half-century ago that under certain circumstances the PUC had jurisdiction over the relationship between a public utility and its parent holding company in the absence of a statute conferring such authority.

In *General Telephone,* although the Supreme Court ultimately found the facts distinguishable from those in *Pacific Telephone*, the court concluded that

case law developments after *Pacific Telephone* cast serious doubt on that case's continued vitality. (*General Telephone, supra,* 34 Cal.3d at p. 826.) Among other things, the *General Telephone* court observed that the court had become "more willing to permit regulatory bodies to exercise powers not expressly stated in their mandate" in the years after the *Pacific Telephone* decision. (*General Telephone,* at p. 825.) The Supreme Court also stated that the "[*Pacific Telephone*] court's observations regarding the commission's powers to control the relationship between utilities and their parents or affiliates have succumbed to regulatory realism." (*Id.* at p. 826.) In short, *Pacific Telephone* provides little support for the holding companies' position.

In lieu of case authority supporting their position, the holding companies offer examples of express statutory grants of jurisdiction over holding companies. These examples purportedly demonstrate that when the Legislature chooses to expand the PUC's jurisdiction, it does so explicitly and precisely.

There are very few references in the Public Utilities Code to holding companies. The holding companies point to section 314, subdivision (b), and section 798, as examples of statutes in which the Legislature has seen fit to define PUC authority, or lack of authority, over holding companies.

Section 314 concerns the authority of the PUC to inspect the accounts and records of public utilities and their affiliates. In subdivision (a), the statute provides in relevant part that the PUC and its agents "may, at any time, inspect the accounts, books, papers, and documents of any public utility." (§ 314, subd. (a).) Subdivision (b) extends this inspection authority to subsidiaries and affiliates of public utilities, providing that "[s]ubdivision (a) also applies to inspections of the accounts, books, papers, and documents of any business which is a subsidiary or affiliate of, or a corporation which holds a controlling interest in, an electrical, gas, or telephone corporation with respect to any transaction between the electrical, gas, or telephone corporation and the subsidiary, affiliate, or holding corporation on any matter that might adversely affect the interests of the ratepayers of the electrical, gas, or telephone corporation." (§ 314, subd. (b).)

EIX contends that, if the PUC's interpretation of the scope of its authority were correct, then "there would have been no reason for the Legislature to have enacted a provision granting limited access to holding company records, because the holding companies would already be within the Commission's jurisdiction." According to EIX, the limited statutory grant of a right to inspect holding company records in section 314, subdivision (b), "would be unnecessary if merely being a utility's parent holding company conferred regulatory jurisdiction upon the Commission."

EIX's argument is premised on the mistaken assumption that the PUC claims jurisdiction over the holding companies simply because they have controlling interests in public utilities. Instead, the PUC claims limited jurisdiction over the holding companies based on its statutory power to impose conditions upon approving changes in control of, or issuances of securities by, public utilities. Section 314, subdivision (b), is not mere surplusage, because it confirms the PUC's authority to inspect the records of all holding companies, not just those which have agreed to a similar PUC condition imposed at the time the holding company was formed. Moreover, EIX's argument suggests the PUC claims *general* regulatory jurisdiction over the holding companies, when the PUC merely seeks to enforce the specific holding company conditions to which EIX agreed, upon its formation.

In addition, in our review of the legislative history of subdivision (b) of section 314, we find no support for the holding companies' argument that the statute's specific grant of PUC authority over holding companies means, by implication, that the PUC has no authority over holding companies other than what is expressly and unambiguously set forth by statute.[25] Before its amendment in 1985, section 314 referred to the authority of the PUC to inspect the books and records of "any public utility." (Former § 314, as amended by Stats. 1951, ch. 764, § 314, pp. 2035–2036.) In 1985, Assembly Bill No. 116 added subdivision (b), which extended the PUC's inspection authority to encompass subsidiaries or affiliates of telephone corporations. (Former § 314, subd. (b), as amended by Stats. 1985, ch. 1249, § 1, p. 4299.) The author of the legislation carried the bill at the request of the PUC, citing the need for regulatory oversight as telephone corporations diversified and entered into unregulated lines of business that might create a potential for harm to telephone ratepayers. (Assem. Com., 3d reading analysis of Assem. Bill No. 116 (1985–1986 Reg. Sess.) June 20, 1985, p. 2.) In its Enrolled Bill Report to the Governor, the PUC, as principal sponsor of the legislation, pointed out there is "no clear authority . . . which authorizes the PUC to audit the books and papers of a non-regulated affiliated or subsidiary company of the utility . . . ." (PUC Legal Division, Enrolled Bill Rep. on Assem. Bill No. 116 (1985–1986 Reg. Sess.) Sept. 25, 1985, pp. 1–2.) The PUC expressed a "need for legislative expression clarifying the PUC's authority . . . ." (*Id.*, p. 2.)

■ One year after amending section 314 to apply to telephone company affiliates, the Legislature amended the statute again to extend its application

---

[25] On our own motion, we take judicial notice of the legislative history of Assembly Bill No. 116 (1985–1986 Reg. Sess.) (Stats. 1985, ch. 1249, § 1, p. 4299) and Senate Bill No. 2331 (1985–1986 Reg. Sess.) (Stats. 1986, ch. 845, § 1, p. 2893), which added and amended subdivision (b) of section 314. (Evid. Code, §§ 452, subd. (c), 459; *Kern v. County of Imperial* (1990) 226 Cal.App.3d 391, 400, fn. 8 [276 Cal.Rptr. 524] [appellate court may take judicial notice of legislative history materials on own motion].)

to affiliates or subsidiaries of electrical and gas corporations, as well as to corporations holding a controlling interest in such entities. (§ 314, subd. (b), as amended by Stats. 1986, ch. 845, § 1, p. 2893.) Specifically referring to SDG&E's original 1985 application to form a holding company, an analysis of the bill stated: "In the recent PUC decision allowing SDG&E to form a holding company, the PUC imposed a number of conditions with respect to the access to books and records. These conditions, uncontested by SDG&E, includ[ed] establishing a valid presumption for PUC information requests and an objection proceeding which can be followed by a utility, holding company or affiliate . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 2331 (1985–1986 Reg. Sess.) Aug. 22, 1986, p. 2.) Although the legislative analysis acknowledged the conditions imposed in *SDG&E I*, there is nothing in the analysis to suggest that the PUC lacked authority to enforce the conditions or that the legislation was being proposed to give the PUC authority to enforce the conditions in *SDG&E I*. Rather, a fair reading of the legislative history suggests that the intent of Senate Bill No. 2331 was to expand the inspection authority provided by condition in *SDG&E I* (and applicable only to SDG&E's holding company) to all holding companies with controlling interests in public utilities. The legislative history therefore implies the PUC can exert jurisdiction over holding companies *either* through legislation directed at all holding companies *or* through PUC conditions imposed at the time a particular holding company is formed. Therefore, we conclude that section 314, subdivision (b), does not support a conclusion that the PUC lacks authority to enforce conditions imposed by the PUC pursuant to sections 818, 819, or 854.

■ Section 798, like section 314, subdivision (b), provides no support for the contention that the PUC lacks jurisdiction to enforce the holding company conditions. Section 798 subjects utilities, but not holding companies or other affiliates, to penalties for cross-subsidizing payments made by utilities to, or received from, affiliates. EIX contends that the Legislature's enactment of section 798 "confirms that the Commission's jurisdiction is limited to utilities . . . ." We disagree. The Legislature's decision to give the PUC power to levy penalties against public utilities but not against holding companies for violations of section 798 does not indicate a general intent to deprive the PUC of jurisdiction over holding companies under all circumstances. Furthermore, the statute does not indicate any specific intent to deprive the PUC of authority to enforce conditions imposed upon holding companies at the time of their formation.

As a further statutory argument, the holding companies assert that even where the PUC has statutory authority to impose penalties upon entities other than public utilities, the PUC lacks authority to enforce such penalties. Thus,

according to the holding companies, section 2111,[26] which subjects persons and entities other than public utilities to penalties for violating orders or decisions of the PUC, has no independent jurisdictional significance. To enforce section 2111, the holding companies contend, the PUC must rely on section 2101, which requires the Attorney General, at the PUC's request, to "institute and prosecute actions or proceedings for the enforcement of the Constitution and statutes of this State affecting public utilities and or the punishment and all violations thereof."

The holding companies further argue that the PUC cannot rely for jurisdictional authority on section 2113,[27] which gives the PUC contempt powers over public utilities and all others that fail to comply with PUC orders. EIX contends that the PUC's alleged invocation of section 2113 concerning contempt power begs the question of whether the PUC has jurisdiction to impose a valid order on a nonutility in the first place.

The holding companies' contentions regarding sections 2111 and 2113 are unhelpful. In these proceedings, the PUC expressly disclaims any reliance on sections 2111 or 2113 to assert specific jurisdiction over the holding companies, and the PUC acknowledges that these sections require an otherwise valid order before they can be enforced. Furthermore, giving the PUC power under section 2101 to request that the Attorney General prosecute violations of the Public Utilities Code does not imply that the PUC has no enforcement authority of its own. Section 2101 simply gives the PUC another tool for enforcing the Public Utilities Code; it does not give exclusive enforcement authority to the Attorney General. Indeed, because section 2101 is not limited to enforcement actions against nonutilities, to conclude that the PUC's enforcement authority is dependent on an Attorney General penalty action, as the holding companies suggest, would mean the PUC has no independent enforcement power at all, even against public utilities. Therefore, we disagree with the contention that only the Attorney General can pursue actions to

---

[26] Section 2111 provides: "Every corporation or person, other than a public utility and its officers, agents, or employees, which or who knowingly violates or fails to comply with, or procures, aids or abets any violation of any provision of the Constitution of this state relating to public utilities or of this part, or fails to comply with any part of any order, decision, rule, direction, demand, or requirement of the commission, or who procures, aids, or abets any public utility in such violation or noncompliance, in a case in which a penalty has not otherwise been provided for such corporation or person, is subject to a penalty of not less than five hundred dollars ($500), nor more than twenty thousand dollars ($20,000) for each offense."

[27] Section 2113 provides: "Every public utility, corporation, or person which fails to comply with any part of any order, decision, rule, regulation, direction, demand, or requirement of the commission or any commissioner is in contempt of the commission, and is punishable by the commission for contempt in the same manner and to the same extent as contempt is punished by courts of record. The remedy prescribed in this section does not bar or affect any other remedy prescribed in this part, but is cumulative and in addition thereto."

enforce valid PUC orders against nonutilities. To the extent sections 2111 and 2113 have any relevance here, they tend to support the PUC's jurisdictional position because they constitute examples of the Legislature's granting the PUC limited authority over nonutilities, contrary to the holding companies' contention that the PUC's authority is restricted to public utilities.

The holding companies also dispute an interpretation of sections 818, 819, or 854 that confers PUC jurisdiction over a holding company by virtue of its agreement to abide by specific conditions as a prerequisite to PUC approval of a holding company structure. As a variant of this argument, PG&E Corporation points out that it was not even a party to the holding company proceedings that led to the decisions in *PG&E I* and *PG&E II*. Thus, PG&E Corporation contends the PUC had no jurisdiction at the time it issued the holding company decisions, much less continuing jurisdiction to enforce them.

While it is true the holding companies were not parties to the proceedings that led to the holding company decisions, this fact is unremarkable because the proceedings to approve the holding companies necessarily preceded the actual creation of the holding companies. Though they are not public utilities, the holding companies were formed pursuant to statutory processes and approvals from the PUC, subject to conditions the PUC imposed as part of its statutory public interest mandate to safeguard the public when utilities reorganize.

■ PG&E Corporation points out, too, that section 818, under which PG&E Utility made its application to form a holding company, is directed only against public utilities. Therefore, according to PG&E Corporation, the PUC cannot claim jurisdiction over a holding company formed pursuant to section 818. We disagree. Although section 818 does not mention holding companies, section 819 gives the PUC broad latitude to subject section 818 approvals to whatever conditions it deems necessary and reasonable. Section 819 does not contain the restrictions PG&E Corporation reads into the statute.

■ We conclude that the PUC may enforce the holding company conditions even in the absence of express statutory authority to do so because the PUC's jurisdiction to enforce the conditions is implied from its unchallenged statutory authority to impose them.

### 4. *The Holding Company Conditions Are Not Contractual Obligations.*

The holding companies would avoid PUC enforcement of the holding company conditions with the argument that the conditions are contractual and may only be enforced by bringing an action in superior court. The PUC

counters that the Public Utilities Code provides the PUC with regulatory, as opposed to contractual authority. In addition, the PUC points out that treating the conditions as contractual obligations in superior court would effectively give the superior court the power to review, contradict, or interfere with an order of the PUC, in violation of section 1759. As discussed below, we agree with the PUC's concern about violating section 1759.

The statutory language of sections 819 and 854 gives no indication the Legislature intended the PUC to enter into any type of contract as a means to fulfill its mandate to protect the interests of ratepayers. Section 819 allows the PUC to grant utility applications "subject to such conditions *as it deems* reasonably and necessary." (Italics added.) The statute contains no reference to an agreement, indicating the PUC has sole authority to determine appropriate conditions. Likewise, section 854, which gives the PUC the authority to "[p]rovide mitigation measures" (§ 854, subd. (c)(8)), suggests the PUC has unilateral authority to establish such measures.[28] The fact the holding companies chose to agree to the conditions imposed by the PUC does not convert the PUC's orders into contracts.

In support of their position, the holding companies rely heavily on our Supreme Court's decision in *Henderson v. Oroville-Wyandotte Irr. Dist.* (1931) 213 Cal. 514 [2 P.2d 803] (*Henderson*). In *Henderson*, the Railroad Commission, the predecessor of the PUC, approved the sale of two regulated water companies' systems to an unregulated irrigation district on the condition *the unregulated irrigation district enter into contracts with the water users* regarding rate guarantees to ensure that the unregulated district would not raise rates substantially. (*Id.* at p. 527.) The irrigation district adopted resolutions stating it would charge users a specified rate for a particular time period, and the PUC adopted the resolutions as conditions of its approval of the sale. The irrigation district never executed a written contract with the users. (*Id.* at p. 525.) When the district later raised its rates above the agreed upon levels, the users brought a contract action in superior court against the irrigation district. The Supreme Court held that the Railroad Commission had the power to impose conditions upon its approval of the sale to the irrigation district, and it further held that the conditions were binding upon the

[28] We note that section 854 requires the PUC to "consider" certain criteria in determining whether a proposed merger, acquisition, or change in control proposal is in the public interest, including whether the proposal "[p]rovide[s] mitigation measures to prevent significant adverse consequences which may result." (§ 854, subd. (c)(8).) Although this statutory language might be interpreted to leave the PUC in the position of passively approving or rejecting mitigation measures proposed by the applicants, the practical consequence of the PUC's approval authority is that it can prescribe the mitigation measures required for approval. Indeed, the holding companies do not dispute the PUC's authority to dictate conditions upon its approval of applications under sections 818 or 854.

unregulated irrigation district, notwithstanding its failure to enter into contracts with its users. (*Id.* at pp. 528–532.) According to the Supreme Court, "[the district's] subsequent refusal to enter into such contracts with the outside water users did not entitle it to hold the property conveyed to it free from the conditions imposed by the Railroad Commission, and which it had consented to by its . . . resolutions." (*Id.* at p. 527.)

The holding companies argue that *Henderson* stands for the proposition that PUC conditions imposed on nonutilities can be enforced only in superior court as contract actions. We disagree. *Henderson* confirms the Commission's authority to impose conditions even in the absence of express statutory authority to do so. (*Henderson, supra,* 213 Cal. at p. 529.) However, the case is factually distinguishable and has little relevance to the dispute before us. The Commission was not itself a party in *Henderson,* nor was *Henderson* concerned with any effort by the Commission to enforce its conditions. There was simply no reason to discuss or consider the proper forum for the PUC (or Railroad Commission) to enforce conditions against entities other than public utilities. Moreover, *Henderson* does not concern a purported contract between the PUC and an otherwise unregulated entity, as the holding companies allege in these proceedings. Indeed, in contrast to *Henderson,* in which the unregulated irrigation district agreed to enter into a contract with third parties, here the holding companies were not required to enter into contracts.[29] And whereas the holding companies seek to treat the holding company conditions as an implied contract between the PUC and the holding companies, the Supreme Court in *Henderson* held there was an *explicit* contract between the water users and the irrigation district, reflected in the district's resolution adopted at the time of the transfer of the irrigation systems. (*Henderson,* at pp. 527–528.) *Henderson* provides no support for the theory that the holding company conditions constitute contract terms between the PUC and the holding companies. Indeed, we are aware of no cases in which the PUC sought to enforce agreed-upon conditions in a superior court action where the conditions were treated or characterized as contract terms.[30]

---

[29] As discussed in the original *SDG&E I* decision, the PUC expressly rejected the approach of requiring the holding companies to enter into contracts. (*SDG&E I, supra,* 20 Cal.P.U.C.2d at pp. 686–687.)

[30] In *People ex rel. Pub. Util. Com. v. City of Fresno* (1967) 254 Cal.App.2d 76 [62 Cal.Rptr. 79] (*City of Fresno*), the PUC brought a superior court action challenging the City of Fresno's condemnation of public utility property, an action the PUC contended violated conditions it had imposed on the sale of the property to the City of Fresno. *City of Fresno* does not stand for the proposition that PUC conditions are contract terms enforceable in superior court. Among other things, the City of Fresno refused to accept the PUC conditions and proceeded to acquire the public utility property through its powers of eminent domain. (*Id.* at p. 79.)

The facts of *Henderson* are also distinguishable from the relevant facts here because *Henderson* involved the sale of property to an unregulated entity, not the formation of a holding company that has an ongoing relationship with a public utility. While one could argue that the PUC has no regulatory interest in property no longer in the possession of a public utility, the same cannot be said of the PUC's interest in regulating ongoing activity between a holding company and its utility subsidiary. A PUC attempt to enforce conditions against an unregulated entity that at one time purchased assets from a public utility would likely fail the requirement that the PUC's authority must be cognate and germane to utility regulation.

In support of their contention that PUC conditions equate with contract terms, the holding companies focus on cases in which the PUC has placed conditions on sales of utility assets to unregulated entities, not on cases involving the formation of holding company structures or other corporate reorganizations. Thus, for example, Sempra relies on a number of cases standing for the proposition that the PUC has no authority to interpret contracts between public utilities and third parties that have been entered into as conditions to the PUC's approval of a property sale. (See *Bartlett v. Rogers* (1951) 103 Cal.App.2d 250, 254 [229 P.2d 434]; *Dillingham v. Schipp* (1957) 154 Cal.App.2d 553, 558 [316 P.2d 1014].) Because these cases presuppose the existence of a contract entered into as a consequence of the PUC's approval of a sale of utility property to an unregulated entity, they are inapposite. By enforcing the holding company conditions, the PUC does not seek to assert jurisdiction to interpret or enforce a contract between a public utility and a third party.[31]

Citing *Orange County Cable Communications Co. v. City of San Clemente* (1976) 59 Cal.App.3d 165 [130 Cal.Rptr. 429] (*Orange County Cable*), EIX contends that case law after *Henderson* confirms "that governmental regulatory commissions may enforce conditions against non-utilities not as a regulator, but only as a contracting party." We disagree with EIX's broad characterization of the holding in *Orange County Cable*. In that case, the court began by noting that the appellant, a cable television service that sought to raise its rates in its cable franchise with the City of San Clemente, was not a public utility. (*Id.* at p. 170.) The court noted that, if "appellant is not a public utility, the only possible relationship of the parties is one based on contract." (*Id.* at p. 171.) Here, in contrast to a relationship characterized by a franchise agreement between a city and an unregulated entity, the relationship

---

[31] We note, too, that the holding companies overstate the limitation on the PUC's authority over contracts between public utilities and third parties. It has long been recognized that the PUC has the power to reform contracts of public utilities to make them conform to the public interest. (*CLAM, supra,* 25 Cal.3d at p. 907; *Southern Pac. Co. v. Spring Valley Water Co.* (1916) 173 Cal. 291, 298 [159 P. 865].)

between the PUC and the holding companies is one based on conditions the PUC is statutorily empowered to impose. Furthermore, whereas a city's cable franchise agreement with an unregulated entity may have no nexus to the regulation of a public utility, the PUC's assertion of jurisdiction to enforce the holding company conditions is plainly relevant, cognate and germane to the regulation of the public utilities owned by the holding companies.

One of the most compelling reasons to reject the holding companies' characterization of the holding company conditions as contract terms is that requiring the PUC to bring a breach of contract action to enforce the conditions would enmesh the superior court in the PUC's performance of its duties. Section 1759, subdivision (a), provides in relevant part that "[n]o court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation therefor, or to enjoin, restrain, or interfere with the commission in the performance of its official duties . . . ."

By treating the holding company conditions as terms in a contract, the superior court would presumably have the power to reform the contract or even to find that the parties never entered into a valid contract. Such remedies amount to correcting or annulling a decision of the PUC in violation of section 1759. Moreover, even if this court were to accept the holding companies' position, then both the superior court and the PUC would be charged with enforcing the *same* conditions contained in a single PUC decision, with the superior court having jurisdiction over the holding companies, and the PUC having jurisdiction over the utilities.

Sempra maintains that section 1759 is inapplicable because it applies only to regulated entities, relying on *Hartwell, supra,* 27 Cal.4th at page 280. In *Hartwell,* the Supreme Court stated that "when read in context with the entire regulatory scheme, section 1759 must be read to bar superior court jurisdiction that interferes with the PUC's performance of its *regulatory* duties, duties which by constitutional mandate apply only to regulated utilities." (*Id.* at pp. 280–281, italics in original.) Once again, we emphasize that language in an opinion must be understood in light of the facts and the issue then before the court. (*Id.* at p. 281.) As discussed above, the PUC was not a party in *Hartwell,* nor did the case involve an attempt by the PUC to enforce its own orders. Rather, *Hartwell* concerned an unregulated entity claiming that section 1759 precluded a superior court action against the entity because similar issues were pending before the PUC in proceedings involving

regulated public utilities.[32] (27 Cal.4th at p. 280.) Here, in contrast to the facts in *Hartwell*, the PUC seeks to enforce its own orders as part of its regulatory duties. A superior court action treating the PUC's orders as contracts would clearly interfere with the PUC's regulatory duties.

5. *The PUC Has Been Consistent in Claiming Jurisdiction to Enforce the Holding Company Conditions.*

Contrary to the holding companies' characterizations of the PUC's position, the PUC has consistently held that the Public Utilities Code grants it authority to enforce the holding company conditions. Indeed, since the *SDG&E I* decision in 1986, the PUC has not wavered from the position that it has jurisdiction to enforce the conditions imposed in the holding company conditions.

In the *SDG&E I* decision, the PUC emphatically rejected the contract theory the holding companies now espouse, concluding it had ample authority to enforce the holding company conditions without requiring the utility and holding company to name the PUC as a third-party beneficiary to an agreement containing the conditions. (*SDG&E I, supra,* 20 Cal.P.U.C.2d at p. 686.) PG&E Corporation disputes the interpretation and effect of the PUC's statements in *SDG&E I*, claiming that it is not bound by the *SDG&E I* decision and that, in any event, the discussion of the PUC's enforcement powers in *SDG&E I* fails to mentions the forum where enforcement is to take place.

We do not suggest that PG&E Corporation is bound by the PUC's decision on jurisdiction in the *SDG&E I* decision. The decision is relevant, however, because it establishes that the PUC has consistently maintained its jurisdiction to enforce the holding company conditions. (See *Yamaha Corp., supra,* 19 Cal.4th at pp. 14–15 [agency interpretations entitled to greater weight when agency has been consistent in its approach].) Moreover, we note that, despite the PUC's clear assertion of jurisdiction to enforce the conditions beginning with the original holding company decision in *SDG&E I*, there is no mention in subsequent holding company decisions of the applicant utilities' objecting to such jurisdiction.

PG&E Corporation is incorrect, too, in asserting that the PUC in *SDG&E I* never indicated where enforcement of the conditions was to take place. The

---

[32] The Supreme Court in *Hartwell* stated: "By no stretch of language or logic does [section 1759] mean that trial courts may not decide issues between parties not subject to PUC regulation simply because the same or similar issues are pending before the PUC or because the PUC regulates the same subject matter in its supervision over public utilities." (*Hartwell, supra,* 27 Cal.4th at p. 280.)

context of the discussion on enforcement in *SDG&E I* is a concern by several parties that the PUC had "questionable jurisdiction to enforce any conditions . . . ." (*SDG&E I, supra,* 20 Cal.P.U.C.2d at p. 686.) The PUC responded that *it* could enforce the conditions against both the utility and the holding company. (*Ibid.*) The PUC went on to describe power the PUC possessed to ensure compliance with its orders, and it emphasized that it would "not hesitate to utilize the full breadth of our constitutional and statutory authority . . . to ensure compliance." (*Id.* at p. 687.) In short, the decision in *SDG&E I* supports a conclusion the PUC can enforce the holding company conditions in a proceeding before the PUC.

EIX contends that the PUC announced its jurisdictional position "for the first time" in these proceedings, a contention that ignores completely the history of the holding company proceedings that began with *SDG&E I.* Indeed, EIX makes no mention of the *SDG&E I* decision in its petition, referring to the 1988 *Edison* decision as the "original" holding company decision. EIX also claims that "[n]ot a single word" in the *Edison* decision hints that the PUC believed it was acquiring jurisdiction over the holding companies, and EIX cites from the dissent in *Edison* in which a commissioner voiced his concern about the PUC's lack of jurisdiction over holding companies.

As discussed above, the *SDG&E I* decision unambiguously communicated the PUC's position on enforcement of the holding company conditions. And, as the first holding company decision to follow *SDG&E I,* the *Edison* decision contains myriad references to *SDG&E I,* the actual original holding company decision. (*Edison, supra,* 27 Cal.P.U.C.2d at p. 362 ["We reference the conditions to those we imposed in the SDG&E decision and take them one by one for discussion"].) Furthermore, the dissent supports the conclusion the PUC has limited jurisdiction to enforce the holding company conditions. The dissenting commissioner in *Edison,* while expressing jurisdictional concerns, clearly focused on the PUC's lack of general jurisdiction over the holding companies, while acknowledging the PUC's power to enforce the conditions adopted in the *Edison* order: "[U]nder this decision the most important tool we have for protecting ratepayers—our regulatory authority—is seriously undermined. Much of the authority that the CPUC has over [Edison] and *its* subsidiaries as a regulated utility is being transferred to a holding company over which we have no direct authority and *only limited ability—primarily what we require in this order as conditions for formation of the holding company—* to control *or regulate* the new affiliate relationships under the holding company structure." (*Edison, supra,* 27 Cal.P.U.C.2d at p. 395, italics added (dis. opn. of Comr. Vial).) Accordingly, EIX cannot genuinely claim it was unaware of the PUC's jurisdictional position.

In support of its position that the PUC lacks jurisdiction to enforce the holding company conditions, Sempra quotes from the *SDG&E II* decision in which the PUC acknowledged that "[a] condition neither adds to nor diminishes our regulatory control." (*SDG&E II, supra,* 62 Cal.P.U.C.2d at p. 643.) Far from supporting Sempra's position, the quoted statement is consistent with the PUC's assertion of jurisdiction. The PUC was responding to a request by the Division of Ratepayer Advocates seeking a separate condition confirming the PUC's regulatory control to enforce the conditions. In rejecting this proposal, the PUC was merely indicating that a condition was unnecessary to confirm the PUC's power to impose and enforce conditions. Indeed, the PUC rejected such an approach to avoid establishing utility regulation as of the date of the *SDG&E II* decision as the standard by which all future regulation of *SDG&E and its affiliates* would be assessed. (*Ibid.*)

In addition to arguing it is not bound by earlier holding company decisions, PG&E Corporation contends that the PUC has conceded the lack of jurisdiction over PG&E Corporation, citing pleadings filed by the Office of Ratepayer Advocates (ORA) and referring to the ORA as a "component organization of the Commission."[33] As the PUC points out and, as illustrated by the discussions in the holding company decisions, ORA's positions are not those of the PUC, and ORA does not speak for the PUC. (See, e.g., *SDG&E I, supra,* 20 Cal.P.U.C.2d at p. 686.) Furthermore, many of the ORA comments are taken out of context and fail to reflect the ORA's concern that the PUC would not be able to regulate the holding company as it would a utility, with general regulatory authority.

Similarly, statements in dissents, cited by all of the holding companies, are not indicative of the PUC's position. Although two commissioners disagreed with the PUC's original decision denying the holding companies' motions to dismiss, the PUC itself remained consistent. Furthermore, in the decision denying the petition for rehearing, all of the commissioners who participated, including a commissioner who originally dissented, agreed the PUC has jurisdiction to enforce the holding company conditions.

6. *Because the PUC's Grounds for Assertion of Jurisdiction Are Sufficient We Need Not Consider Alternative Grounds for Jurisdiction Addressed by the Holding Companies.*

The holding companies devote considerable attention to alternative grounds upon which the PUC relied in its original decision for denying the motions to dismiss. Thus, for example, EIX objects to a "hodge-podge" of equitable

---

[33] ORA was previously referred to as DRA (Division of Ratepayer Advocates), and before that as PSD (Public Staff Division). For simplicity's sake, we refer to all of these divisions as ORA.

theories offered by the PUC in its original decision denying the motions to dismiss, arguing that EIX did not voluntarily submit to jurisdiction, is not bound by principles of estoppel or unclean hands, and is not barred from collaterally attacking the *Edison* holding company decision. Sempra and PG&E Corporation, too, attack the equitable grounds for jurisdiction cited by the PUC in its original decision.

Because the PUC does not assert jurisdiction to enforce the holding company conditions on the grounds disputed by the holding companies, we need not address them. We agree with the PUC that its reliance on statutory grounds for imposing and enforcing the holding company conditions suffices to establish the PUC's limited jurisdiction over the holding companies.

Sempra and EIX argue that the PUC's assertion of authority to modify the holding company conditions after the holding company is formed unfairly subjects the holding companies to unpredictable rules. These arguments focus on the PUC's reliance in its original decision on section 1708, which gives the PUC the authority to rescind, alter, or amend any order or decision made by it upon notice to the parties. Like the equitable theories for jurisdiction criticized by the holding companies, the PUC's jurisdiction to modify or add to the holding company conditions is not at issue. In its order denying rehearing, the PUC expressly deleted statements in its original decision concluding that the PUC had jurisdiction to add to or modify the holding company conditions. The PUC stated in that order it "has no immediate plans to modify or add to the conditions that were originally imposed on the holding companies. Moreover, to the extent changes are necessary, the modified conditions may only pertain to the utilities rather than the holding companies." (Cal.P.U.C. Dec. No. 02-07-044, *supra*, at p. 8, 2002 Cal.PUC LEXIS 430, at pp. *12–*13.)

Although Sempra acknowledges in its opening brief that the PUC has deleted its holdings regarding its power to add to or modify the conditions, Sempra still argues that the PUC does not concede its lack of authority to modify the conditions in the future, suggesting that we should address the applicability of section 1708 at this juncture.[34] We decline to address the issue. Because the PUC does not rely on section 1708 as justification for its jurisdiction or actions here, Sempra is essentially requesting an advisory opinion on the issue, which we cannot provide. (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 174 [188 Cal.Rptr. 104, 655 P.2d 306] (*Pacific Legal*).)

---

[34] In a footnote its reply brief, Sempra concedes that the issue is not before the court, although Sempra still makes clear its disagreement with the position that the PUC has power to alter or amend the holding company decisions long after a holding company is formed.

### D. *Is the PUC's "Interim Interpretation of the First Priority Condition" Ripe for Review?*

Contending that the PUC's "interim interpretation of the first priority condition" amounts to a fundamental rewrite of the condition, the utilities and holding companies ask this court to annul the PUC's order, which they claim is not supported by substantial evidence and constitutes an abuse of discretion. Petitioners argue that the condition requires only that they "maintain a certain debt-equity ratio, level of capital expenditure, or level of 'equity investment' in the utilities' plant and equipment." (Cal.P.U.C. Dec. No. 02-01-039, *supra,* at p. 2, 2002 Cal.PUC LEXIS 5, at p. *1.) The PUC maintains that the condition, at least under certain circumstances, requires that the holding companies "infuse all types of 'capital' into their respective utility subsidiaries . . . ." (*Ibid.,* 2002 Cal.PUC LEXIS 5, at p. *2.)

In response to petitioners' request for appellate review, the PUC contends that because it has not determined that any of the holding companies or utilities have actually violated the first priority condition, its interim decision on the condition's interpretation is not ripe for review.[35] Accordingly, we first address whether the decision is ripe for review.

"[A] basic prerequisite to judicial review of administrative acts is the existence of a ripe controversy." (*Pacific Legal, supra,* 33 Cal.3d at p. 169.) "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. . . . [T]he ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Id.* at p. 170.) The basic rationale of the doctrine " 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " (*Id.* at p. 171, quoting *Abbott Laboratories v. Gardner* (1967) 387 U.S. 136, 148–149 [18 L.Ed.2d 681, 87 S.Ct. 1507], disapproved on other grounds in *Califano v. Sanders* (1977) 430 U.S. 99, 105 [51 L.Ed.2d 192, 97 S.Ct. 980].)

---

[35] Real party in interest City and County of San Francisco, too, questions whether the issue *is ripe for review in its answer,* stating: "The petitions at bar . . . do not involve the question of whether the Holding Companies and/or the Utilities in fact have violated the Holding Company Conditions. That question has yet to be fully presented to or fully addressed by [the PUC]."

In *Pacific Legal,* the Supreme Court rejected as unripe a claim that the public access guidelines of the California Coastal Commission were facially invalid. (*Pacific Legal, supra,* 33 Cal.3d at pp. 163, 167–175.) Noting that federal courts have frequently addressed the issue of ripeness in the context of "an attempt to obtain review of the propriety of administrative regulations prior to their application to the party challenging them," the court adopted a two-pronged ripeness analysis used by the United States Supreme Court in *Abbott Laboratories v. Gardner,* requiring an evaluation of (i) "the fitness of the issues for judicial decision" and (ii) "the hardship to the parties of withholding court consideration." (*Pacific Legal, supra,* 33 Cal.3d at p. 171, italics omitted; see *Abbott Laboratories v. Gardner, supra,* 387 U.S. at p. 149.)

Under the first prong of the test, PG&E Corporation contends the issues are ripe for review, asserting that even the PUC does not dispute the fitness for judicial review of the interpretation of the first priority condition. To be sure, the conflicting interpretations of the first priority condition offered by the PUC and petitioners present a stark contrast. The mere fact the parties have adverse positions concerning the condition's interpretation, however, does not render the issues appropriate for immediate judicial resolution. (See *Pacific Legal, supra,* 33 Cal.3d at p. 172.) Even when parties have clearly adverse positions, the posture of a case may require a court to speculate about unpredictable future events in order to evaluate the parties' claims. (*Ibid.*; cf. *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 708–709 [7 Cal.Rptr.3d 868].)

Because the PUC has yet to apply its interpretation of the first priority condition to a concrete set of facts, the dispute petitioners would like this court to resolve is abstract. This problem is compounded by the PUC's own nebulous interpretation of the first priority condition, which is couched in a variety of undefined qualifiers: "*At least under certain circumstances*, we find that the [first priority] condition includes the requirement that the holding companies infuse all types of 'capital' into their respective utility subsidiaries *when necessary to fulfill the utility's obligation to serve.*" (Cal.P.U.C. Dec. No. 02-01-039, *supra,* at p. 2, italics added.) Moreover, the PUC did not conclusively require the holding companies to infuse all types of capital into their respective utility subsidiaries, but instead issued an order declaring that the "first priority condition *does not preclude* the requirement that the holding companies infuse all types of 'capital' into their respective utility subsidiaries . . . ." (*Id.* at p. 43, italics added.)

In effect, the PUC has defined the first priority condition, which is admittedly vague, with an almost equally ambiguous interpretation. Even petitioners concede the intractable uncertainty of the PUC's order. For

example, EIX and Edison complain that the first priority condition is so ill-defined by the PUC's interim interpretation that it is unclear when and under what circumstances the holding companies have an obligation to infuse capital into their utility subsidiaries. EIX and Edison further argue that "[t]he impracticality, and indeed impossibility, of attempting to operate under the Commission's unlimited definition is demonstrated by the extraordinary number of new terms that it would require the parties and the courts to simply concoct in order to implement this provision. . . . What must be the financial condition of the utility for the condition to be triggered? How long must that condition have existed? If the utility's need is a result of operating costs the Commission is required by law to provide for in rates, must the holding company act at all?"

 The concerns voiced by EIX and Edison demonstrate why the interim decision is not fit for judicial review. Without further definition of the circumstances under which the first priority condition comes into play, we would be engaging in guesswork in determining whether substantial evidence supports the PUC's interim interpretation. Sempra asserts that the interpretation of the first priority condition "presents an actual dispute with respect to a question of law," suggesting in effect that we provide declaratory relief. It is well settled, however, that we will deny a petition without reaching substantive issues if a petitioner is not in fact aggrieved by an action of the PUC and "the petition is in effect seeking declaratory relief."[36] (*CLAM, supra,* 25 Cal.3d at p. 904.) Moreover, an action for declaratory relief "must be based on an actual controversy with known parameters. If the parameters are as yet unknown, the controversy is not yet ripe for declaratory relief. [Citation.]" (*Sanctity of Human Life Network v. California Highway Patrol* (2003) 105 Cal.App.4th 858, 872 [129 Cal.Rptr.2d 708].) The parameters of the controversy here have yet to be defined. Accordingly, despite the very different interpretations of the condition espoused by the parties, we conclude the issues are not yet appropriate for meaningful appellate review.

As for the second prong of the ripeness test, requiring a showing of hardship, the PUC contends that petitioners have demonstrated no hardship as a consequence of withholding court consideration of the decision. The PUC also points out that the interim opinion involves an *initial* interpretation of the first priority condition, and the investigation in which the decision arises is ongoing. According to the PUC, this decision is no different from any other interlocutory decision, which generally must wait until after a final judgment for appellate review. (See *Babb v. Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379].)

---

[36] We note, too, that the PUC typically refrains from affording declaratory relief to parties absent a concrete dispute. (*Re Pacific Bell* (1998) 83 Cal.P.U.C.2d 265, 268.)

Petitioners contend that the "interim" label affixed to the decision has no bearing on its finality or whether it is ripe for review. We agree that the characterization of the decision is not determinative, because it is the concrete effect on the petitioner that matters. (See, e.g., *Phonetele, Inc. v. Public Utilities Com.* (1974) 11 Cal.3d 125, 129, fn. 2 [113 Cal.Rptr. 16, 520 P.2d 400] [decision designated "Interim Opinion" was clearly final because it required petitioner to employ a costly protective device immediately].)

Petitioners also contend that the effects of the interim decision are concrete, not hypothetical, because they must now abide by the first priority decision as interpreted by the PUC. Sempra, for example, contends that the interim opinion imposes current legal obligations on the holding companies, even though it does not purport to require any immediate action. Indeed, Sempra goes so far as to claim that the interim decision affects its stock prices and its ability to raise capital or borrow money in the financial markets at the lowest possible rate, citing the "chilling" effect on the debt markets when there is an implicit threat of future noncompensatory rates. EIX and Edison complain about the uncertainty of operating "literally in the dark," not knowing when the PUC might call upon EIX to infuse capital into its utility subsidiary.

While the petitioners may justifiably complain about the PUC's vague interpretation of the first priority condition, they have not demonstrated that the PUC's decision has had any concrete effects. Among other things, the PUC has not yet determined whether any of the holding companies in fact violated the first priority condition. Furthermore, although Sempra claims the interim decision imposes current legal obligations on the holding companies, it acknowledges that no current action is required and that the condition would only potentially come into play "if utility rates again become insufficient to cover the cost of wholesale power . . . ." As far as we are aware, none of the holding companies have done anything differently as a consequence of the PUC's decision.[37]

Thus, despite the holding companies' characterization of these concerns as concrete, they are in fact speculative, depending on a set of circumstances that have not been shown to be imminent. (Cf. *Santa Teresa Citizen Action Group v. City of San Jose, supra,* 114 Cal.App.4th at p. 708 ["Courts will not be drawn into disputes that depend for their immediacy on speculative future events"].) Absent extraordinary circumstances, this court cannot engage in appellate review of administrative proceedings simply

---

[37] At oral argument, counsel for the PUC opined that it would be premature for petitioners to modify their conduct based on the initial interpretation of the first priority condition, although the PUC would expect the petitioners to conform their conduct and abide by a final PUC decision.

because someone claims uncertainty as a consequence of a vague statute or regulation. We must wait until an administrative agency has issued a decision with concrete consequences from which relief may properly be sought.

PG&E Corporation claims a different sort of hardship resulting from the PUC's interim interpretation, pointing out that the PUC's decision is being used as the basis for lawsuits brought against PG&E Corporation by the California Attorney General and others under Business and Professions Code section 17200.[38] According to PG&E Corporation, the PUC's decision is ripe for review because the plaintiffs in the pending cases rely in part on the PUC's interim interpretation as the basis for seeking restitution of $5 billion from PG&E Corporation and at least $500 million in civil penalties.

 The pendency of the superior court actions against PG&E Corporation raises the question of when, if at all, the existence of a superior court action premised on a violation of a PUC order renders the PUC's order ripe for review. Ordinarily, the fact that there are pending actions in other courts based on actual violations of administrative regulations does not render an unripe dispute any more suitable for resolution. Thus, for example, in *Pacific Legal*, our Supreme Court rejected an attempt to rely on the facts of cases then pending before other courts as the basis for asserting the existence of a ripe controversy. (*Pacific Legal, supra,* 33 Cal.3d at p. 169.) The court conceded that such cases were relevant in the general sense they showed the challenged California Coastal Commission guidelines were "actually being applied by the Commission." (*Ibid.*) The court noted, however, that "[t]he particular facts of and contentions made in those cases are not before us, and it would be improper to review and discuss them to support our decision on the merits of the instant case." (*Ibid.*)

Likewise, the facts of the superior court actions and the arguments of the parties in those cases are not before us. On the record before this court, we simply know that actions have been filed against PG&E Corporation on the basis of, among other things, an asserted violation of the first priority

---

[38] At the request of PG&E Company, we take judicial notice of the complaints filed against PG&E Corporation by the People of the State of California (Super. Ct. S.F. City and County, No. CGC-02-403289), the City and County of San Francisco (Super. Ct. S.F. City and County, No. CGC-02-404453), and by Cynthia Behr (Super. Ct. Santa Clara County, No. CV805274). (Evid. Code, §§ 452, subd. (d), 459.) We also take judicial notice of briefs filed by The Utility Reform Network and Aglet Consumer Alliance in rulemaking proceedings before the PUC. (Evid. Code, § 452, subd. (c), 459; *Fowler v. Howell* (1996) 42 Cal.App.4th 1746, 1750 [50 Cal.Rptr.2d 484] ["Evidence Code section 452, subdivision (c) permits the trial court to take judicial notice of the records and files of a state administrative board"].) PG&E Company requests judicial notice of the latter two documents for the purpose of showing that litigants in proceedings now before the PUC are relying on the interim interpretation of the first priority condition.

condition. None of the parties have brought to our attention any judgments or other appealable orders arising out of the superior court actions. In short, just as the concerns are hypothetical in the ongoing PUC investigation, so too are the concerns hypothetical in the superior court actions against PG&E Corporation.

 We acknowledge that a superior court action premised on a violation of a PUC order poses the peculiar problem that section 1759 precludes the superior court from reviewing the propriety of the PUC order that forms the basis for the action. Thus, although a party to a superior court action based on the violation of an administrative regulation could ordinarily challenge the validity of the regulation, no such challenge to a PUC order can be made in superior court. (§ 1759.) According to PG&E Corporation, the PUC's interim interpretation is final as to PG&E Corporation because it has no opportunity outside of this proceeding to challenge the propriety of the interpretation.

 PG&E Corporation's argument that the superior court is bound by the PUC's interpretation begs the question of when the PUC's decision is ripe for review. Must we wait until there is a resolution of the superior court actions before we can conclude that a party has suffered or will suffer hardship as a result of the challenged PUC decision? Or does the act of filing a superior court action satisfy the hardship prong of the ripeness analysis? Presumably, the filing of a patently meritless action would not amount to a hardship, but we cannot be expected to analyze the merits of an action pending in another court in order to determine whether a controversy is ripe for review. Taken to its logical extreme, PG&E Corporation's ripeness analysis implies that the mere threat of a superior court action premised on a PUC decision renders any PUC decision immediately ripe for review, because there is no opportunity in any subsequently filed superior court action to challenge the PUC's decision. Such a rule, however, would violate the basic principle that a controversy must be ripe as a prerequisite to judicial review. Section 1759 was intended to *limit* judicial review of PUC decisions by vesting jurisdiction to review or reverse such decisions only in the Courts of Appeal and the Supreme Court; it was not intended to have the consequence of mandating review in *all* cases, regardless of whether a controversy otherwise satisfies ripeness requirements.

Moreover, PG&E Corporation's position seems to suggest that we must proceed to decide the substantive issues presented because PG&E Corporation is otherwise defenseless in the superior court actions. However, on the record before us we have no basis to conclude PG&E Corporation's defenses have been played out in the superior court actions. As far as we are aware, the superior court has yet to decide whether the relief sought in the superior court actions would interfere with a continuing regulatory policy of the PUC,

in violation of section 1759.[39] (See *San Diego Gas & Electric Co. v. Superior Court, supra,* 13 Cal.4th at pp. 918–919.) When asked at oral argument about jurisdictional concerns in the superior court actions, counsel for petitioners responded by citing *Vila v. Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469 [43 Cal.Rptr. 654] (*Vila*), for the proposition that the superior courts have jurisdiction to decide if PUC orders have been violated.

In *Vila,* the Court of Appeal held that the superior court had jurisdiction to mandate that a public utility provide water service in accordance with an unambiguous PUC rate schedule because such jurisdiction is "in aid and not in derogation of the jurisdiction of the [PUC]." (*Vila, supra,* 233 Cal.App.2d at pp. 470, 479.) Significantly, the court in *Vila* emphasized repeatedly that the PUC order at issue was "unambiguous." (*Id.* at pp. 470, 474, 479 [utility's obligation was clear under an "unambiguous provision"].) The court further pointed out that "[n]o administrative study, survey, or investigation was necessary" to assess the public utility's obligations. (*Id.* at p. 479.)

Here, in contrast to *Vila,* the challenged PUC decision could hardly be characterized as unambiguous. In addition, further investigation is necessary to assess what the holding companies must do to comply with the first priority condition. For the superior court to rule on claims premised on violations of the first priority condition, it will necessarily have to decide in the first instance what "circumstances" require the holding companies to infuse capital into their utility subsidiaries, an inquiry being made simultaneously by the PUC in the ongoing investigation instituted by the Order Instituting Investigation.

■ These issues, among others, have yet to be resolved in the superior court actions, and they illustrate why the pendency of a superior court action premised on a violation of a PUC decision, by itself, does not render a PUC decision ripe for review. Among other things, the mere pendency of the superior court actions does not satisfy the first prong of the ripeness analysis by making the issues any more defined for immediate judicial resolution. We are still faced with an abstract dispute without reference to concrete facts. A party seeking judicial review of an administrative decision must establish *both* that the issues are sufficiently defined for appellate review and that the party faces hardship as a consequence of court inaction.

■ Accordingly, we conclude that the interim decision on the interpretation of the first priority condition is not ripe for review. However, because a summary denial of the petitions for review would foreclose further review of

---

[39] We express no opinion on the superior court's jurisdiction to interpret and enforce the holding company conditions.

the interim decision (see pt. III.A, Propriety of Writ Review, *ante*), we affirm the PUC's decisions on the interim interpretation of the first priority condition without prejudice to the right of any party to raise the issue after there has been a determination whether the condition has been violated.

## IV. DISPOSITION

The PUC's decisions denying the holding companies' motions to dismiss (Cal.P.U.C. Dec. Nos. 02-01-037 and 02-07-044) are affirmed. The PUC's decisions on the interim interpretation of the first priority condition (Cal.P.U.C Dec. Nos. 02-01-039 and 02-07-043) are affirmed without prejudice to the right of any party to raise the issue anew after there has been a determination whether one or more of the holding companies have violated the first priority condition and, if so, what remedies are appropriate.

Stevens, J., and Simons, J., concurred.

Petitioners' petition for review by the Supreme Court was denied September 1, 2004. Chin, J., did not participate therein.