Filed 7/15/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CALIFORNIA COMMUNITY CHOICE ASSOCIATION, Petitioner, v. PUBLIC UTILITIES COMMISSION, Respondent; PACIFIC GAS AND ELECTRIC COMPANY, Real Party in Interest. | A168807 (Commission Decision No 23-08-052 and Resolution E-5258) |

The Public Utility Code[1] authorizes the creation of a public entity, known as a Community Choice Aggregator (CCA), to pool or aggregate the electricity load of its residents and businesses, and to purchase electricity on their behalf. (§ 331.1, subd. (a).) When a community choice aggregation program is implemented or expanded, the Public Utility Code directs the Public Utilities Commission (PUC or Commission) to, among other things, "designate the earliest possible effective date" for the implementation or expansion of the community choice aggregation program. (§ 366.2, subd. (c)(8).)

Petitioner California Community Choice Association (the Association), a California nonprofit mutual benefit corporation that represents the

---

[1] All undesignated statutory references are to the Public Utility Code.

interests of CCAs, seeks reversal of a Commission resolution setting the effective dates for the expansion of two community choice aggregation programs and the Commission's decision denying rehearing of the resolution. The Association contends that the Commission exceeded the scope of its jurisdiction by relying on grounds not expressly authorized under section 366.2 to designate the effective date. Alternatively, the Association contends that the resolution must be set aside because the Commission failed to proceed in a manner required by law and because it lacks factual support. We find no error and deny the petition.

BACKGROUND

## I.    Statutory Background

Section 366.2 governs the implementation and expansion of a community choice aggregation program. Section 366.2, subdivision (a)(4) states: "The implementation of a community choice aggregation program shall not result in a shifting of costs between the customers of the community choice aggregator and the bundled service customers of an electrical corporation." Section 366.2, subdivision (d)(1) provides: "It is . . . the intent of the Legislature to prevent any shifting of recoverable costs between customers." To further this intent, sections 366.2, subdivisions (d), (e), and (f) enumerate specific costs that the CCAs' customers must pay to ensure their costs are not shifted to the customers who remain with the electrical corporation when they depart for the CCA.

Under section 366.2, subdivision (c), after a CCA has adopted an implementation plan and submitted it to the Commission, the Commission must determine the amount of any cost recovery (the amount the CCA must pay to reimburse the electrical corporation for costs incurred on behalf of departing customers) and designate the "earliest possible effective date" for

2

implementation or expansion of the community choice aggregation program.
(§ 366.2, subd. (c)(5), (7) and (8).)

Once implemented, CCAs are subject to the resource adequacy program adopted by the Commission pursuant to section 380 to ensure that all load serving entities maintain adequate physical generating capacity to meet peak demand.  (§ 380, subd. (e), (h).)  One of the goals of the resource adequacy program is to "[e]quitably allocate the cost of generating capacity and . . . prevent [the] shifting of costs between customer classes."  (§ 380, subd. (b)(3).) Section 380, subdivision (e), authorizes the Commission to "exercise its enforcement powers to ensure compliance [with the requirements for resource adequacy] by all load-serving entities."

## II.    Factual Background

Central Coast Community Energy (CCCE) and East Bay Community Energy (EBCE) are existing CCAs for different regions in California.

On December 7, 2022, CCCE lodged with the Commission an addendum to its original implementation plan, which proposed to expand CCCE's service to the City of Atascadero effective January 2024.  The following day, EBCE lodged with the Commission an addendum to its original implementation plan proposing to expand its operations to the City of Stockton, also effective January 2024.

On March 27, 2023, the Commission served Draft Resolution E-5258 on CCCE, EBCE, and others for comment.  The Draft Resolution set January 1, 2025, as the earliest possible effective date for CCCE's and EBCE's expansions.

CCCE, EBCE, and the Association, among others, submitted comments in opposition to the Draft Resolution asserting that the Commission had

3

exceeded its jurisdiction and failed to proceed in a manner required by law in setting the earliest possible effective date.

On April 28, 2023, following a hearing the previous day, the Commission adopted Resolution E-5258 as proposed.

On May 30, 2023, the Association and CCCE (but not EBCE) filed applications for rehearing of Resolution E-5258.

On September 5, 2023, the Commission made modifications to the factual findings in the Resolution but otherwise denied the rehearing applications. Resolution E-5258, as modified by the decision denying rehearing, explains the basis for the selection of January 2025 as the earliest possible effective date for the CCCE's and EBCE's expansion of service as follows: "CCCE and EBCE have each failed in the past to procure the required amount of capacity based on their existing customer load, as demonstrated by numerous citations issued for violations of the Commission's Resource Adequacy program. These procurement failures coincided with periods of extreme electricity scarcity, including in 2021 and 2022, and ultimately contributed to impermissible cost shifting from the CCAs to customers of investor-owned utilities . . . . The Commission has a statutory duty to ensure that the implementation of CCA programs does not result in such cost shifting. [¶] The Commission cannot conclude at this time that the implementation of CCCE and EBCE's planned expansions will not cause further cost shifting in 2024. Accordingly, consistent with Sections 366.2(a)(4) and 366.3,[2] the Commission cannot confirm the

---

[2] Section 366.3 reads: "Bundled retail customers of an electrical corporation shall not experience any cost increase as a result of the implementation of a community choice aggregator program. The commission shall also ensure that departing load does not experience any cost increases

proposed effective dates in 2024. Instead, the Commission establishes January 1, 2025, as the earliest possible effective date for the implementation of CCCE and EBCE's expansions, subject to revision by a further Commission order."

As modified, the resolution makes the following relevant factual findings:

Finding 9: "Due to Resource Adequacy program procurement deficiencies in 2022, incremental excess resources, paid for by all Load Serving Entity customers, functioned in part as backfill to make up for specific Load Serving Entity deficiencies, rather than being available to provide the full system reliability benefit that was intended, which caused a cost shift."

Finding 11: "Based on the history and pattern of Central Coast Community Energy and East Bay Community Energy's Resource Adequacy deficiencies, and how Resource Adequacy deficiencies can lead to cost shifting, Central Coast Community Energy and East Bay Community Energy have contributed to cost shifting onto Investor-Owned Utility bundled customers."

Finding 12: "The Commission has concerns regarding the ongoing ability of Central Coast Community Energy and East Bay Community Energy to meet Resource Adequacy requirements and is not aware of any evidence that demonstrates that the risk of cost shifting continuing has been adequately mitigated."

Finding 14: "Because the Commission cannot conclude that Central Coast Community Energy and East Bay Community Energy's planned

---

as a result of an allocation of costs that were not incurred on behalf of the departing load."

expansions will not cause further cost shifting, it would be unreasonable to confirm the proposed effective dates in 2024."

On October 5, 2023, the Association filed the present petition for writ of review.

DISCUSSION

## I. Writ of Review

### A. Propriety of Review

Section 1756, subdivision (a) authorizes "any aggrieved party" to file a petition for a writ of review in the court of appeal. This court may summarily deny the petition for review if it is procedurally inadequate or lacks substantive merit. (*Leone v. Medical Board* (2000) 22 Cal.4th 660, 670; *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1193 [court is not " 'compelled to issue the writ if the PUC did not err' "].) Where, however, " 'writ review is the exclusive means of appellate review of a final order or judgment, an appellate court may not deny an apparently meritorious writ petition, timely presented in a formally and procedurally sufficient manner, merely because, for example, the petition presents no important issue of law or because the court considers the case less worthy of its attention than other matters.' " (*PG&E Corp. v. Public Utilities Com.*, *supra*, at p. 1193.)

Here, we granted a writ of review because the petition presented an important and unsettled legal question as to the Commission's jurisdiction and we believed oral argument would be helpful in resolving the issues. Ultimately, we have concluded, as discussed below, that the Association is not entitled to relief and deny the petition. (See *PG&E Corp. v. Public Utilities Com.*, *supra*, 118 Cal App.4th at p. 1193 [granting a writ of review

6

because the petitions presented important and unsettled legal questions but denying the requested relief].)

## B. Standing

The Commission argues, in footnote 7 of its answer, that the Association is not an aggrieved party with standing to seek review under section 1756.  It acknowledges, however, that no California court has addressed the meaning of "aggrieved party" as used in that section.  The Association did not respond to this issue in its reply brief; on the other hand, by relegating the issue to a footnote, the Commission did not properly raise it. (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947.)  In any event, we conclude that the Association has standing to file a writ petition on behalf of the CCAs under the associational standing doctrine.  That doctrine requires that " '(a) [the association's] members would otherwise have standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1004; see also *The Assn. of Deputy Dist. Attorneys Etc. v. Gascón* (2022) 79 Cal.App.5th 503, 515 [finding that union has standing under the associational standing doctrine to file a petition for writ of mandate under Code Civ. Proc. § 1086].)  Nothing in the Commission's footnote identifies any basis to question that the requirements of the doctrine are satisfied here, and therefore that the Association possesses standing at least on that basis.

## C. Standard of Review

The parties dispute whether this proceeding is governed by the scope of review found in sections 1757 or 1757.1.  Section 1757 provides, in relevant

7

part, that "[i]n a complaint or enforcement proceeding, or in a ratemaking or licensing decision of specific application that is addressed to particular parties, the review by the court shall not extend further than to determine, on the basis of the entire record which shall be certified by the commission, whether any of the following occurred:  (1) The commission acted without, or in excess of, its powers or jurisdiction. [¶] (2) The commission has not proceeded in the manner required by law. [¶] (3) The decision of the commission is not supported by the findings. [¶] (4) The findings in the decision of the commission are not supported by substantial evidence in light of the whole record. [¶] (5) The order or decision of the commission . . . was an abuse of discretion."  Section 1757.1 provides the grounds for review "[i]n any proceeding other than a proceeding subject to the standard of review under Section 1757" and includes each of the grounds listed above, except for the fourth ground authorizing a substantial evidence review of the Commission's findings.  (§ 1757.1, subd. (a)(1)–(4).)

Legislative history confirms that the statutes were intended to provide differing standards of review based on the types of proceeding before the court:  "[T]his bill . . . [p]rovides for more expansive judicial oversight of most PUC decisions by both the California Supreme Court and the courts of appeal as follows: [¶] a) Provides that decisions of the PUC will be subject to judicial review on grounds similar to the grounds for review of other state agency decisions. [¶] b) Clarifies that in adjudicatory or ratemaking cases, the review by the court shall be under the substantial evidence test. [¶] c) Provides that in any proceeding other than those subject to the substantial evidence standard of review (i.e., rulemaking or quasi-legislative cases), review by the court shall be under the abuse of discretion standard."  (Assem. Com. On Judiciary, Analysis of Sen. Bill No. 779 (1997–1998 Reg. Sess.) as amended

8

Aug. 17, 1998, p. 1.)  This committee analysis adds, "this bill would provide for:  (1) 'substantial evidence' review of PUC cases involving rates charged, or service changes requested, by individual companies, complaints against individual companies, and enforcement actions against individual companies; and, (2) 'abuse of discretion' review of all other PUC cases, primarily rulemakings, major policy decisions and generic ratemaking proceedings affecting more than one utility or the entire utility industry." (*Id*. at p. 7.) The bill analysis acknowledges that "[i]t is unclear . . . how the courts will review mixed decisions or orders of the Commission that involve aspects of both ratemaking and nonratemaking in the same order or decision," and that "courts will have to sort out in the future which particular review standard or standards should apply in these mixed cases." (*Id*. at p. 8.)

The Association concedes that this is not a complaint or enforcement proceeding or a licensing procedure.  It argues that this is a ratemaking proceeding so that section 1757 governs.  It also argued in its petition for rehearing before the Commission that the Commission's failure to categorize the proceedings, as required by section 1701.1, left the standard of review open to interpretation.

Under section 1701.1, subdivision (a), "[t]he commission shall determine whether each proceeding is a quasi-legislative, an adjudication, a ratesetting, or a catastrophic wildfire proceeding." Section 1701.1, subdivision (d) provides, "(1) Quasi-legislative cases, for purposes of this article, are cases that establish policy, including, but not limited to, rulemakings and investigations that may establish rules affecting an entire industry. [¶] (2) Adjudication cases, for purposes of this article, are enforcement cases and complaints except those challenging the reasonableness of any rates or charges as specified in Section 1702. [¶]

9

(3) Ratesetting cases, for purposes of this article, are cases in which rates are established for a specific company, including, but not limited to, general rate cases, performance-based ratemaking, and other ratesetting mechanisms." Rule 1.3, subpart (g), of the Commission's Rules of Practice and Procedure (Cal. Code Regs., tit. 20, § 1.3) (hereafter Rule 1.3) defines "Ratesetting proceedings" as "proceedings in which the Commission sets or investigates rates for a specifically named utility (or utilities), or establishes a mechanism that in turn sets the rates for a specifically named utility (or utilities)." (See also *Southern Cal. Gas Co. v. Public Utilities Com.* (1979) 23 Cal.3d 470, 476, [" ' "The basic principle [of ratemaking] is to establish a rate which will permit the utility to recover its cost and expenses plus a reasonable return on the value of property devoted to public use" ' ", italics omitted].)

In denying the Association's petition for rehearing, the Commission somewhat confusingly agreed that the proceeding would be categorized as "ratesetting" under Rule 1.3(g) and considered the sufficiency of the evidence to support the resolution's factual findings under section 1757, but at the same time stated that its "actions here were legislative, as opposed to adjudicatory." In these writ proceedings, the Commission argues that its decision setting an effective date for the proposed expansions is not a ratesetting proceeding but rather an informal proceeding, which it defines under its General Order 96-b, General Rule 3.7 as "an advice letter or draft resolution submitted for disposition outside a formal proceeding," and which it asserts is reviewed under the standard set forth in section 1757.1. (See Cal. Pub. Util. Com., General Order 96-B (Jan. 12, 2012), General Rule 3.7, p. 4.)

Although the Commission's decision in this case is applicable only to the specific CCAs and is based on the prior resource adequacy deficiencies of those entities, we agree with the Commission's characterization of its actions

10

as quasi-legislative rather than quasi-adjudicative. The Commission determined, as a matter of policy or discretion, that the expansions should be delayed in order to ensure that expansion did not result in a specific type of cost shifting. The decision does not specifically involve a "complaint or enforcement proceeding, or . . . a ratemaking or licensing decision of specific application that is addressed to particular parties." (§ 1757.) Because section 1757.1 applies to "*any* proceeding other than a proceeding subject to the standard of review under Section 1757," (italics added), it would seem, under the plain statutory language, to govern the present proceeding. (See *Southern Cal. Edison Co. v. Public Utilities Com.* (2002) 101 Cal.App.4th 384, 395, fn. 14 [where proceeding is not one specifically enumerated in § 1757, § 1757.1 governs].)

This conclusion, however, does not preclude all review of the factual determinations made and relied on by the Commission. In determining whether the Commission abused its discretion, we consider "whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support." (*Securus Technologies, LLC v. Public Utilities Com.* (2023) 88 Cal.App.5th 787, 803 (*Securus Technologies*).) And, as discussed above, under section 1757.1, an order may be set aside if "[t]he decision of the commission is not supported by the findings." (§ 1757.1, subd. (a)(4).)

## II. Jurisdiction

The Association's petition alleges that the Commission acted without, or in excess of, its powers or jurisdiction in setting the effective date of the CCAs' expansions. The Association asserts that, while the Commission has broad jurisdiction to regulate privately owned utilities (Cal. Const., art. XII, § 3), "[i]t has no authority . . . to regulate public agencies . . . absent a statute expressly authorizing such regulation." (*Monterey Peninsula Water*

11

*Management Dist. v. Public Utilities Com.* (2016) 62 Cal.4th 693, 698.)  The

Association argues that no statute expressly authorized the Commission's

decision and that the Commission's setting of the expansion dates conflicts

with its "essentially . . . ministerial" duties under section 366.2,

subdivision (c)(8).[3]

As enacted in 2002 by Assembly Bill No. 117, section 366.2,

subdivision (c)(7) read, "Within 90 days after the community choice

aggregator establishing load aggregation files its implementation plan, the

commission shall certify that it has received the implementation plan,

including any additional information necessary to determine a cost-recovery

mechanism.  After certification of receipt of the implementation plan and any

additional information requested, the commission shall then provide the

community choice aggregator with its findings regarding any cost recovery

that must be paid by customers of the community choice aggregator to

prevent a shifting of costs as provided for in subdivisions (d), (e), and (f)."

Section 366.2, subdivision (c)(8) read, "No entity proposing community choice

aggregation shall act to furnish electricity to electricity consumers within its

boundaries until the commission determines the cost recovery that must be

paid by the customers of that proposed community choice aggregation

---

[3] Citing Public Utilities Code Section 701 and *PG&E Corp. v. Pub. Utilities Com.* (2004) 118 Cal.App.4th 1174, 1197, the Commission argues that its jurisdiction is broader than asserted by the Association and in fact encompasses "the ability to 'do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are necessary and convenient' in the exercise of its jurisdiction" over public utilities . . . and *entities adjacent to public utilities*."  We need not resolve this dispute because we conclude, as discussed below, that the Commission's decision was a proper exercise of the authority expressly granted to it by section 366.2, subdivision (a)(4).

program, as provided for in subdivisions (d), (e), and (f). The commission shall designate the earliest possible effective date for implementation of a community choice aggregation program, taking into consideration the impact on any annual procurement plan of the electrical corporation that has been approved by the commission." Section 366.2, subdivision (d) expresses the "intent of the Legislature to prevent any shifting of recoverable costs between customers" and subdivisions (d), (e), and (f), set forth specific recoverable costs. Specifically, subdivisions (d) and (e) require recovery from CCA customers of costs incurred by the California Department of Water and Power related to the 2000–2001 energy crisis, and subdivision (f) requires recovery of the investor-owned utility's past undercollections for energy purchases and a share of future new unavoidable electricity purchase costs from long-term contracts executed while the customer was a customer of an investor-owned utility.

In 2005, the Commission offered the following interpretation of the scope of its authority under section 366.2 when presented with a CCA's implementation plan: "Generally, we find that AB 117 does not provide us with authority to approve or reject a CCA's implementation plan or to decertify a CCA but to assure that the CCA's plans and program elements are consistent with utility tariffs and consistent with Commission rules designed to protect customers." Accordingly, the Commission adopted "a simple procedure for the filing of an implementation plan." As relevant here, the decision states, "[W]e apply Section 366.2[, subdivision] (c)(8) by herein finding that the earliest possible implementation date for the CCA program was the effective date of the tariffs filed pursuant to D.04-12-046 in Phase 1 of this proceeding. The utilities shall immediately undertake to affect the system changes required to satisfy the tariffs as soon as it receives a binding

13

commitment from a single CCA. It should complete its work within six months for the first CCA in its territory. The earliest possible implementation date for a CCA's provision of service would be the date of the completion of all tariffed requirements, but no later than six months after notice from the first CCA or the date the CCA and the utility agree is reasonable. In no event may the utility delay the initiation of CCA service once the utility has implemented the required processes and infrastructure and the CCA has fulfilled tariffed requirements." (Italics omitted.)

As relevant here, section 366.2, subdivisions (c), (d), (e), and (f) have not been substantively amended since adoption and interpretation by the Commission. Accordingly, the Association contends that the Commission's authority to select the effective date of an expansion under section 366.2, subdivision (c)(8) is limited to ensuring satisfaction of the cost recovery required under subdivisions (d), (e), and (f) and "consideration [of] the impact on any annual procurement plan of the electrical corporation that has been approved by the commission." It asserts that "Section 366.2 does not contain any express provisions that allow the Commission to delay CCA implementation or expansion based on a CCA's [resource adequacy] procurement shortfalls."

The Commission disputes the Association's argument that its 2005 decision interpreted its authority under section 366.2, subdivision (c) as narrowly as the Association now suggests. The Commission argues that its prior decision recognized the " 'ongoing relationship' between the CCAs and the investor-owned utilities" and its related authority "to act where '[CCA's] program elements may affect utility operations and the rates and services to other customers' " and " 'to exercise limited jurisdiction over non-utilities in furtherance of their regulation of public utilities, including resource

14

adequacy.' " We need not resolve the parties' dispute as to the proper interpretation of the 2005 decision, however, because we agree with the Commission's alternative argument that subdivision (a)(4) of section 366.2, added in 2011, expanded its jurisdiction and gives it authority to act to prevent any cost shifting that might result from the implementation or expansion of a CCA, including setting the effective date based on cost-shifting concerns unrelated to those identified in section 366.2, subdivisions (d), (e), and (f).

Section 366.2, subdivision (a)(4), provides: "The implementation of a community choice aggregation program shall not result in a shifting of costs between the customers of the community choice aggregator and the bundled service customers of an electrical corporation." In denying rehearing, the Commission wrote: "[O]ur responsibility to ensure that the implementation of a CCA program does not cause a cost shift is ongoing. If evidence demonstrates that the expansion of CCCE or EBCE could result in a cost shift, the implementation violates sections 366.2(a)(4) . . ., and we are obligated to prevent such a possibility." The plain language of subdivision (a)(4) charges the Commission with ensuring that the expansion of a CCA to new service areas will not result in cost shifting between CCA and non-CCA customers. Subdivision (c)(8) specifically vests the Commission with authority to designate the earliest possible effective date for the expansion of a CCA. Nothing in Section 366.2, subdivision (c)(8) precludes the Commission from setting an effective date for an expansion in such a way as to exercise its authority under subdivision (a)(4) to prevent cost shifting. The Association's arguments to the contrary are not persuasive.

Contrary to the Association's arguments, section 366.2 does not expressly limit the Commission's authority to designate the effective date for

15

an expansion under subdivision (c)(8) to determination of the cost recovery required by subdivisions (d), (e) and (f).  The first sentence of subdivision (c)(8) prohibits a CCA from furnishing electricity to consumers "until the commission determines the cost recovery that must be paid by the customers of that proposed community choice aggregation program, as provided for in subdivisions (d), (e), and (f)."  Subdivision (c)(8) then provides: "The commission shall designate the earliest possible effective date for implementation of a community choice aggregation program, taking into consideration the impact on any annual procurement plan of the electrical corporation that has been approved by the commission."  The first sentence does not expressly or implicitly limit the authority vested in the Commission under the second sentence.

Nor is the cost shifting referenced in section 366.2, subdivision (a)(4) limited to the cost recovery regulated under subdivisions (d), (e) and (f).  The Association argues that subdivision (a)(4) "states a general principle that is informed by the more detailed provisions of subdivisions (d), (e), and (f)" and that "[t]he canons of statutory construction that require reading together the different sections within a statutory provision demonstrate the legislative intent that the CCA customer cost-responsibility methodologies in subdivisions (d), (e), and (f) are the means of preventing the cost-shifting prohibited in subdivision (a)(4)."  We disagree.  If subdivision (a)(4) was intended to be limited or constrained by subdivisions (d), (e), and (f), it would be surplusage.  Given that subdivision (a)(4) was added after the other subdivisions, it must have had some other purpose.  In this case, we read subdivision (a)(4) as expanding the Commission's jurisdiction to prevent cost shifting that results from the expansion of a CCA beyond the cost recovery already regulated in subdivisions (d), (e), and (f).

16

Contrary to the Association's argument, the lack of a specific "provision vesting the Commission with the authority or direction to define 'cost-shifting' for purposes of section 366.2" is not fatal to our interpretation. While the Legislature might have provided such direction, as it has in the other statutes cited by the Association (see § 1093(b) ["The commission shall define financial interest and significant amount of annual compensation for purposes of this subdivision"]; § 1701.1(e)(2) ["The commission shall by rule adopt and publish a definition of decisionmakers and interested persons for purposes of this article"]; § 7939(b) ["The commission, for purposes of this section, shall define 'not in use' "]), the failure to do so does not restrict the Commission's authority to interpret the statute. While additional deference to its interpretation may be appropriate "when an administrative agency exercises a legislatively delegated power to interpret key statutory terms" (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 799), " ' "the opinion of an administrative agency as to a statute's meaning may be helpful even if it is 'not binding or necessarily even authoritative' " ' " (*New Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal.App.4th 784, 809 (*New Cingular Wireless*)). The Commission's determination that cost shifting may occur when a load serving entity fails to procure sufficient resources is not unreasonable. Indeed, section 380 expressly recognizes that cost shifting could occur in the context of the resource adequacy program. (§ 380, subd. (b)(3) [directing the Commission in establishing resource adequacy requirements to "[e]quitably allocate the cost of generating capacity and demand response in a manner that prevents the shifting of costs between customer classes"].)

Finally, "the Commission's 'new and distinct' construction of 'cost-shifting' " does not improperly "broaden the limited scope of the statute." The

17

Association's reliance on the Commission's interpretation of section 366.2 in 2005 is misplaced. Circumstances and the statutory language have changed since that time. In addition to sections 366.2, subdivision (a)(4) and 380 addressed above, in 2015, the Legislature enacted section 366.3, which also indicates concerns generally about cost shifting.[4] (§ 366.3, added by Stats. 2015, ch. 547, § 15, eff. Jan. 1, 2016.) If the Commission concludes that expansion will result in a specific type of impermissible cost shifting, the statute, as amended, permits it to delay expansion to avoid that result. Of course, the Commission's exercise of discretion in that regard is subject to review for abuse, as discussed below.

## III. Procedural Deficiencies

Decisions by the Commission may be set aside when the Commission's failure to proceed in the manner required by law prejudices a party or works to its detriment. (*Calaveras Telephone Co. v. Public Utilities Com.* (2019) 39 Cal.App.5th 972, 980 ["a court of appeal will annul a decision by the Commission if the Commission failed to comply with its own rules and the failure was prejudicial"].)

The Association contends that the Commission did not proceed in the manner required by law when it failed to comply with procedural requirements in section 366.2, subd. (c)(7) and rules 7.2 and 7.3 of the Commission's Rules of Practice and Procedure (Cal. Code Regs., tit. 20, §§ 7.2, 7.3). The Commission correctly argues, however, that because the

---

[4] Section 366.3 reads: "Bundled retail customers of an electrical corporation shall not experience any cost increase as a result of the implementation of a community choice aggregator program. The commission shall also ensure that departing load does not experience any cost increases as a result of an allocation of costs that were not incurred on behalf of the departing load."

18

Association did not raise these arguments in its application for rehearing, they may not be asserted in these proceedings. (§ 1732 ["No corporation or person shall in any court urge or rely on any ground not so set forth in the application [for rehearing]."]) The Association has not responded to the Commission's argument that the issues were not preserved. Nor does it reassert these arguments in its reply. Accordingly, these arguments are not cognizable here.

The Association also argues that the Resolution violates the Commission's enforcement policy as adopted by Resolution M-4846. The Commission responds that Resolution M-4846 is not applicable because this is not an enforcement proceeding, as previously acknowledged by the Association. We agree that the procedural requirements found in Resolution M-4846 are not applicable.

Finally, the Association contends that the Commission failed to categorize the proceeding under Section 1701.1 before issuing the resolution. Although this issue was raised in the Association's petition for rehearing, it was not asserted as a procedural error but in connection with the standard of review issues discussed above. Accordingly, any claim that the decisions must be set aside based on the Commission's failure to comply with Section 1701.1 is also not cognizable on appeal. (§ 1732.)

## V.     Abuse of Discretion

When reviewing the Commission's exercise of discretion, " ' "[t]he scope of review is limited, out of deference to the agency's authority and presumed expertise: 'The court may not reweigh the evidence or substitute its judgment for that of the agency. [Citation.]' " [Citation.] "In general . . . the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support . . . ." [Citation.] When making that

19

inquiry, the " ' "court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." ' " ' " (*Securus Technologies, supra,* 88 Cal.App.5th at pp. 802–803.)

Framed in the context of a substantial evidence review, the Association asserts that Findings 9, 11, 12 and 14 in Resolution E-5258, set forth above, are entirely lacking in evidentiary support. The Association argues that there is no evidence in the record that the violation of the resource adequacy requirements by CCCE and EBCE caused a cost shift in the summer of 2022, that there is no "concrete evidence" in support of the Commission's "concerns" regarding future resource adequacy deficiencies, and that the Commission should have requested "proof of CCCE's and EBCE's ability to meet [resource adequacy] requirements in the future." We understand the Association's argument to have two essential parts: first, that the Commission's finding that a cost shift occurred in September 2022 is entirely lacking in evidentiary support; and second, that even if a cost shift occurred in September 2022, it does not furnish a basis for the Commission to conclude that similar cost shifting will recur if the CCAs are expanded.

The record establishes that CCCE and EBCE have a history of repeatedly violating the Commission's resource adequacy program requirements, as demonstrated by the five citations issued to CCCE between October 2021 and September 2022 and the seven citations issued to EBCE between February 2019 and September 2022. With respect to the September 2022 heat wave, the record also establishes that (1) energy demand exceeded resource adequacy capacity on several days in September 2022; (2) when demand exceeds the available resource adequacy capacity, the market will utilize any other above resource adequacy available

20

capacity and during those days in September resource adequacy capacity was bid into the market; (3) for summer 2022, the Commission required the largest investor-owned utilities to purchase "incremental excess resources" "in addition to the capacity ordered under the Resource Adequacy program, so as to improve system reliability;" (4) all customers, including CCA customers, paid for the excess reserves; and (5) the resource adequacy capacities of CCCE and EBCE were deficient during September 2022 by 290 megawatts (MWs) and 99MWs respectively.

Based on this record, the Commission concluded that costs were shifted from CCCE and EBCE customers to customers of the public utilities when 389 MWs of the 2000 MWs of incremental excess reserves purchased by the public utilities were "used to backfill" the failures of CCCE and EBCE "to fulfill their responsibilities to procure required capacity."  "That is, CCCE and EBCE avoided paying for several hundred MWs of Resource Adequacy resources to meet their own mandatory Resource Adequacy requirements. Instead, all customers paid for over 2,000 MWs of incremental excess resource procurement undertaken by the [investor-owned utilities] at the Commission's direction, and these resources provided reliability capacity that CCCE and EBCE should have paid for directly.  CCCE's and EBCE's customers paid lower costs in rates, which caused a cost shift onto all other customers, including the customers of bundled [investor-owned utilities].  We therefore find that instead of supplying the full intended benefit of an additional buffer of reliability accruable to all customers, the incremental excess resources were used in part to provide Resource Adequacy resources that should have been bought directly by deficient [load serving entities], including CCCE and EBCE."  Finding number 10, which is unchallenged by the Association, adds, "While Central Coast Community Energy and East

21

Bay Community Energy paid fines for their Resource Adequacy program violations, the fines do not reflect the cost to other ratepayers when an entity fails to procure as required to maintain reliability, nor do the fines reimburse ratepayers for cost shifting that may be caused by an entity failing to meet its Resource Adequacy requirements."[5]

While the Association faults the Commission for failing to present evidence that "quantifies or even estimates the level of alleged cost-shifting to which CCCE and EBCE have purportedly contributed," such quantification is not necessary to support the Commission's conclusion that cost shifting occurred. Because the Commission's focus is not on recovering actual costs or penalizing past deficiencies but rather on preventing this type of cost shifting in the future, it is not necessary that the Commission quantify the cost shift that occurred in September 2022. A proper exercise of discretion requires only that the Commission have some factual basis for its finding that a cost shift occurred. It is the challenger's burden to show that an exercise of quasi-legislative power by the Commission was arbitrary, capricious, unlawful, procedurally unfair, or "entirely lacking in evidentiary support." (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 460–461 [" 'the question whether agency action is "entirely lacking in evidentiary support" is not the same as a substantial evidence test' "].)

---

[5] On rehearing, the Commission deleted the following original finding 9 because it was not supported by substantial evidence: "Community Choice Aggregator Resource Adequacy procurement failures in 2022 during stressed electricity system conditions required greater reliance on expensive and extraordinary measures, and thereby contributed to cost shifting onto bundled Investor-Owned Utility customers."

Likewise, the Commission's decision reasonably expresses concerns regarding the ongoing ability of CCCE and EBCS to meet resource adequacy requirements based on their prior deficiencies and the CCAs' failure to present any evidence demonstrating that they had adequately addressed resource adequacy going forward. The draft resolution issued by the Commission contained the same language, stating that it had "concerns regarding [CCCE and EBCE's] ongoing ability to meet Resource Adequacy requirements" and was "not aware of any evidence that demonstrates that the risk of unlawful cost shifting continuing has been adequately mitigated." At oral argument, counsel for the Association acknowledged that it (or CCCE and EBCS) could have attempted to address these concerns by submitting evidence to the Commission but failed to do so. Also at oral argument, counsel for the Commission explained that the Commission concluded that the CCAs' pattern of violating the resource adequacy program requirements and the resulting shifting of its resource adequacy costs to non-customers was likely to continue based on its current year-ahead resource adequacy deficiencies. Counsel for the Commission also acknowledged that, despite setting the effective date for January 2025, the CCAs could submit applications requesting an earlier date and that such applications would be considered if they contained evidence of action and compliance with resource adequacy requirements.

Ultimately, the Commission found that it would be "unreasonable to confirm the . . . effective date requested" because the Commission "cannot conclude that Central Coast Community Energy and East Bay Community Energy's planned expansions will not cause further cost shifting." Although the causal relationship between the planned expansion and the future cost shifting is somewhat tenuous, it is not unreasonable to conclude that the

23

CCAs' failure to procure adequate resources would result in greater cost shifting if the CCAs were permitted to expand to serve more customers.  We cannot conclude, based on the record before us, that the Commission abused its discretion by acting arbitrarily, capriciously, or entirely without evidentiary support in setting an effective date for the expansion of the CCAs based on its concerns regarding future cost shifting.  (*New Cingular Wireless, supra*, 246 Cal.App.4th 784, 806 [" 'a [C]PUC decision has the same standing as a judgment of the superior court:  it is presumed correct, and any party challenging the decision has the burden of proving that it suffers from prejudicial error' "].)

## DISPOSITION

The Commission's decision and resolution (Commission Decision No 123-08-052 and Resolution E-5258) are affirmed.

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
HITE, J. *

---

\* Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Counsel for Petitioner: | DOWNEY BRAND, Thomas J. Macbride, Jr., Megan J. Somogyi, Megan V. Unger, Christopher Marelich |
| Counsel for Respondent: | Christine Hammond, Edward Moldavsky, Elena O. Gekker, Attorneys for California Public Utilities Commission |